# 24-872

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

ELVIN SUAREZ,

*Plaintiff-Appellant*,

v.

ROBERT MORTON, Superintendent, Downstate Correctional Facility, RYAN LAHEY, Office of Mental Health Unit Chief, Downstate Correctional Facility, ABDUL QAYYUM, Psychiatrist, Downstate Correctional Facility, PETER M. HORAN, Supervising Offender Rehabilitation Coordinator, Downstate Correctional Facility, MAURA L. DINARDO, Clinician, NYS Office of Mental Health, SAMANTHA L. KULICK, Psychology Assistant 3/Supervisor, NYS Office of Mental Health, BRANDON N. REYNOLDS, Psychiatrist, NYS Office of Mental Health, CHESNEY J. BAKER, Licensed Master Social Worker 2/Supervisor, NYS Office of Mental Health, ANTHONY J. ANNUCCI, Acting Commissioner, NYS Dep't of Corrections and Community Supervision,

*Defendants-Appellees*,

ANN MARIE SULLIVAN, Commissioner, NYS Office of Metal Health, NYS Dep't of Corrections and Community Supervision, NYS Office of Mental Health,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 7:20-cv-7133, Hon. Vincent L. Briccetti

### BRIEF FOR PLAINTIFF-APPELLANT ELVIN SUAREZ

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20036
ROBERT M. QUACKENBUSH
THE LEGAL AID SOCIETY
49 Thomas Street, 10th Floor
New York, New York 10013

JAMIE A. LEVITT
JOCELYN E. GREER
ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4149
AAvvocato@mofo.com

*Counsel for Plaintiff-Appellant Elvin Suarez*

July 23, 2024

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .........................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF THE ISSUE ..............................................................5

STATEMENT OF THE CASE ...............................................................5

    A.    Factual Background...............................................................5

          1.    Mr. Suarez suffers from schizoaffective disorder, which requires medication to manage .................................................5

          2.    Mr. Suarez arrives at Downstate, where defendants take him off antipsychotic medication and fail to provide adequate treatment, including medication education.................6

          3.    After Mr. Suarez starts decompensating, he is placed in solitary confinement and left without meaningful care for two weeks...................................................................10

          4.    While Mr. Suarez remains in solitary confinement, defendants confirm his history of noncompliance and attest that he will decompensate without medication ...............13

          5.    Defendants recognize the need to divert Mr. Suarez from SHU in light of his mental illness yet sentence Mr. Suarez to keeplock confinement ........................................16

          6.    Mr. Suarez is released after enduring months without medication and therapy and attacks his mother during a psychotic episode .................................................17

    B.    Procedural History..............................................................18

SUMMARY OF ARGUMENT .............................................................22

STANDARD OF REVIEW .................................................................24

ARGUMENT ..................................................................................24

i

A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANTS WERE DELIBERATELY INDIFFERENT TO A SIGNIFICANT RISK TO MR. SUAREZ'S MENTAL HEALTH........................24

    A.    A Triable Issue Exists On Defendants' Deliberate Indifference.........26

        1.    Prison officials may display deliberate indifference by ignoring medical-treatment advice, providing ineffective treatment, and subjecting individuals with serious mental illness to harmful conditions of confinement ...........................26

        2.    Each defendant knew of the risk Mr. Suarez would decompensate without treatment and in solitary or keeplock confinement—or that Mr. Suarez was actually decompensating—yet took no effective action to mitigate that risk...................................................................................32

            i.    Treating defendants ........................................................32

            ii.    DOCCS defendants.........................................................43

    B.    In Concluding Defendants Were Not Deliberately Indifferent, The District Court Misconstrued The Deliberate-Indifference Standard And Improperly Weighed Facts In Defendants' Favor .......46

        1.    Treating defendants...................................................................46

            i.    Contrary to the district court's reasoning, Mr. Suarez did not need to inform defendants of his decompensation for defendants to be aware of such a risk..............................................................................46

            ii.    The district court further erred when discounting the evidence that Mr. Suarez's imminent or actual decompensation was obvious .........................................49

        2.    DOCCS defendants..................................................................52

CONCLUSION ..........................................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Archer v. Dutcher*,
  733 F.2d 14 (2d Cir. 1984) ................................................................45, 54

*Barnes v. Ross*,
  926 F. Supp. 2d 499 (S.D.N.Y. 2013) .............................................50

*Barrett v. Livingston County*,
  No. 14-CV-6593, 2019 WL 1083027 (W.D.N.Y. Mar. 7, 2019) ...............48, 49

*Charles v. Orange Cnty.*,
  925 F.3d 73 (2d Cir. 2019) ...............................................42, 43

*Clark v. Coupe*,
  55 F.4th 167 (3d Cir. 2022) .............................................................31

*Coleman v. Wilson*,
  912 F. Supp. 1282 (E.D. Cal. 1995) ...................................................47

*D'Amico v. City of New York*,
  132 F.3d 145 (2d Cir. 1998) .............................................................24

*Farmer v. Brennan*,
  511 U.S. 825 (1994).................................................25, 38, 51, 52, 53

*Gaston v. Coughlin*,
  249 F.3d 156 (2d Cir. 2001) .............................................................25

*Greason v. Kemp*,
  891 F.2d 829 (11th Cir. 1990) .......................................................28, 34

*Harrison v. Barkley*,
  219 F.3d 132 (2d Cir. 2000) ...............................................34, 38, 40

*Hathaway v. Coughlin*,
  37 F.3d 63 (2d Cir. 1994) .............................................28, 35, 40, 53

*Hunt v. Uphoff*,
  199 F.3d 1220 (10th Cir. 1999) .......................................................27

*Idiakheua v. Morton*,
No. 20-CV-04169 (E.D.N.Y. Feb. 5, 2024) ........................................................19

*Incumaa v. Stirling*,
791 F.3d 517 (4th Cir. 2015) ................................................................................30

*Johnson v. Wright*,
412 F.3d 398 (2d Cir. 2005) ......................................... 24, 26, 27, 35, 36, 37, 45

*King v. Annucci*,
No. 20-CV-1413, 2023 WL 6122868 (N.D.N.Y. Sept. 19, 2023) ....................50

*Langley v. Coughlin*,
888 F.2d 252 (2d Cir. 1989) .................................................................................25

*Lucas v. Turn Key Health Clinics, LLC*,
58 F.4th 1127 (10th Cir. 2023) ....................................................25, 38, 42, 47, 53

*Madrid v. Gomez*,
889 F. Supp. 1146 (N.D. Cal. 1995) ...................................................................47

*Miller v. Schoenen*,
75 F.3d 1305 (8th Cir. 1996) ...............................................................................27

*O'Connor v. Donaldson*,
422 U.S. 563 (1975) ...............................................................................................46

*Palakovic v. Wetzel*,
854 F.3d 209 (3d Cir. 2017) .................................................................................30

*Phillips v. Roane Cnty., Tenn.*,
534 F.3d 531 (6th Cir. 2000) ...............................................................................35

*Porter v. Clarke*,
923 F.3d 348 (4th Cir. 2019) .....................................................25, 30, 32, 44, 54

*Proctor v. LeClaire*,
846 F.3d 597 (2d Cir. 2017) .................................................................................49

*Robinson v. Taylor*,
No. 16-CV-285, 2019 WL 1429529 (N.D.N.Y. Mar. 29, 2019) .................49, 50

iv

*Sample v. Diecks*,
   885 F.2d 1099 (3d Cir. 1989) ...............................................................53

*Scinto v. Stansberry*,
   841 F.3d 219 (4th Cir. 2016) ........................................................33, 37

*Sinkov v. Americor, Inc.*,
   419 F. App'x 86 (2d Cir. 2011) ...........................................................51

*Steele v. Shah*,
   87 F.3d 1266 (11th Cir. 1996) ...............................................27, 28, 34

*Wakefield v. Thompson.*,
   177 F.3d 1160 (9th Cir. 1999) .............................................................43

*Walker v. Schult*,
   717 F.3d 119 (2d Cir. 2013) ................................................................25

*Williams v. Vincent*,
   508 F.2d 541 (2d Cir. 1974) ........................................................28, 35, 40

*Woodward v. Corr. Med. Servs.*,
   368 F.3d 917 (7th Cir. 2004) ........................................................38, 42

**Statutes**

28 U.S.C. § 1291 .......................................................................................1

28 U.S.C. § 1331 .......................................................................................1

28 U.S.C. § 1367 .......................................................................................1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered judgment on February 27, 2024. SPA38. Mr. Suarez timely appealed on March 27, 2024. A38-39; Fed. R. App. Proc. 4(a).

# INTRODUCTION

Elvin Suarez arrived at Downstate Correctional Facility with a diagnosis of schizoaffective disorder; a history of hallucinations, involuntary hospitalizations, suicide attempts, and aggressive outbursts when he goes without treatment; and a prescription for an antipsychotic. Defendants—prison officials and mental-health professionals—recognized the severity of Mr. Suarez's mental illness. Yet they abruptly discontinued Mr. Suarez's prescription and failed to provide him with any meaningful mental-health treatment. Predictably, Mr. Suarez began decompensating by experiencing hallucinations and delusions. Six weeks after his medication was discontinued, he acted out against correction officers. In response, defendants did not belatedly provide Mr. Suarez the treatment he clearly needed. They made matters worse, placing him in solitary and keeplock confinement for weeks. During that time, Mr. Suarez's decompensation was so obvious that it was apparent to his family members. Yet defendants released Mr. Suarez into the community straight from keeplock without ever providing him treatment. That had foreseeable and tragic consequences: the day after his release, Mr. Suarez attacked his mother during a psychotic episode and was committed to a mental-health facility, where he remains today. Defendants' deliberate indifference to Mr. Suarez's serious medical needs violated Mr. Suarez's Eighth Amendment rights.

In seeking summary judgment, defendants argued that their actions (or failures to act) did not constitute deliberate indifference because they did not know Mr. Suarez was at risk of decompensating, much less actually decompensating. But the record shows the opposite. The defendant mental-health professionals knew the severity of Mr. Suarez's illness, acknowledged his need for medication, and admitted that segregated confinement and cessation of medication could exacerbate his illness. These defendants had access to treatment records warning of Mr. Suarez's history of medication noncompliance and that he *would* deteriorate without that medication. And while Mr. Suarez was in their care, these defendants documented symptoms of Mr. Suarez's deterioration, like inappropriate smiling and laughter (signs of hallucinations), poor insight into his mental state, and disciplinary infractions. The defendant correction officials knew much the same: they knew of Mr. Suarez's serious mental illness, observed signs of his decompensation; and received recommendations from mental-health professionals that he be removed from disciplinary confinement. Were that not enough, some defendants applied for—and received—a court order requiring Mr. Suarez to take medication upon release, in which they expressed their understanding that Mr. Suarez would decompensate without medication.

In spite of this knowledge, no defendant provided Mr. Suarez with meaningful treatment at Downstate or attempted to remove him from solitary or keeplock

confinement. Given this evidence—particularly in light of defendants' training and experience—a triable issue of fact exists as to defendants' deliberate indifference to a serious risk of harm to Mr. Suarez's mental health.

The district court nonetheless granted summary judgment, based largely on one fact: Mr. Suarez never told defendants he was experiencing hallucinations. But that cannot establish defendants' lack of knowledge, certainly not as a matter of law. As both the record and common sense indicate, a person with mental illness often does not understand his condition and thus cannot, or will not, advertise his symptoms. Indeed, the evidence shows defendants knew not to rely on Mr. Suarez's accounting of his mental-health state. Compounding this error, the district court weighed the evidence in defendants' favor by discounting as insufficiently probative the warning signs that defendants *did* know about. In effectively demanding direct evidence of knowledge, the district court lost sight of a bedrock Eighth Amendment (and evidentiary) principle: knowledge of a risk may be inferred when that risk is sufficiently obvious.

The district court's judgment should be reversed and the case remanded for trial.[1]

---

[1] Mr. Suarez does not challenge on appeal the dismissal of his Eighth Amendment claims against Anthony Annucci and Ryan Lahey. He also does not challenge the dismissal of his claim under Section 137 of the New York Correction Law.

## STATEMENT OF THE ISSUE

Whether the district court erred in concluding that defendants were not deliberately indifferent to a substantial risk of serious harm to Mr. Suarez.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. *Mr. Suarez suffers from schizoaffective disorder, which requires medication to manage*

Elvin Suarez has suffered from serious mental-health issues his entire adulthood. A367-70. Since 2014, he has regularly heard voices—sometimes a "crowd cheering," sometimes voices "telling him to harm himself," sometimes "a calling from God." A1371-74. Once, when those voices told him to harm himself, he attempted suicide. A1371. Both mental-health professionals and Mr. Suarez's family members have repeatedly observed Mr. Suarez experiencing these hallucinations. A1372-74; *see* A1446. Mr. Suarez also exhibits violent behavior when his mental illness goes untreated: he has assaulted corrections officers while in custody; damaged property; fought with family members; and "pinned" his mother "against the wall with a kitchen chair," causing her to fear for her life. A1373-74. Due to the severity of Mr. Suarez's mental illness, he underwent repeated involuntary hospitalizations between 2014 and 2016; during one hospitalization, he was subjected to a court order for medication over objection. A1372-78.

5

In 2015, Mr. Suarez was arrested for smashing car sideview mirrors with his fist; at Rikers, he was diagnosed with schizoaffective disorder and prescribed an antipsychotic. A1374. Mr. Suarez was deemed unfit to stand trial and committed for the first time to Kirby Forensic Psychiatric Center. In April 2016, Kirby clinicians again diagnosed Mr. Suarez with schizoaffective disorder. A557; A1375. When Kirby clinicians made that diagnosis, they observed that Mr. Suarez "lacked capacity to refuse medication;" indeed, Mr. Suarez refused medication under the misapprehension that he had no mental illness. A1375; *see* A1371-92; A91446. But when Mr. Suarez "began accepting medication," his "symptoms improved" and he "had no further incidents of aggression." A1375. He was sent back to Rikers with an antipsychotic prescription. Later, however, he "became noncompliant" and "quickly decompensated." A1375. He was arrested in 2016, again for breaking car mirrors. A1376. Mr. Suarez was once more deemed unfit for trial and returned to Kirby. A1376. The pattern repeated: although Mr. Suarez initially refused medication, when his "compliance with medication improved," his "psychotic symptoms improved." A1377.

### 2. Mr. Suarez arrives at Downstate, where defendants take him off antipsychotic medication and fail to provide adequate treatment, including medication education

After Mr. Suarez's competence was declared restored and he pleaded guilty, he was transferred to Downstate Correctional Facility, operated by the Department

6

of Community Corrections and Supervision (DOCCS). A1378; A627. Upon his transfer, Mr. Suarez had an active prescription for the antipsychotic Zyprexa. A491. Mr. Suarez's medical records also included a discharge summary from Kirby, which described Mr. Suarez's noncompliance with medication (A1536-37) and contained an "alert" for Mr. Suarez's "[a]ccepting facility to encourage medication compliance as patient will decompensate if non-compliant" (A1448). It is disputed whether those records were available to defendants when Mr. Suarez arrived at Downstate. A967-968 (treating defendant "could not recall one way or the other" whether discharge summary was accessible).

Defendant Samantha Kulick, a psychology assistant employed by New York's Office of Mental Health (OMH), was Mr. Suarez's primary clinician when he was admitted to Downstate.[2] On June 23, 2017, Kulick conducted an intake screening of Mr. Suarez. She noted Mr. Suarez's diagnosis of schizoaffective disorder and that he "is prescribed medication for mood swings" that he described as "go from happy to sad." A491. She further wrote that Mr. Suarez described "auditory hallucinations that 'tell me to hurt myself,'" and documented his prior attempted suicide in response to those hallucinations. A491. And she observed that Mr. Suarez "endorses compliance with his medication and believes same are effective in treating

---

[2] Before this suit was filed, Kulick changed her name to Guth. This brief and its accompanying filings refer to her as Kulick.

his psychiatric symptoms." A491. Accordingly, Kulick recommended he continue his medication and receive individual therapy. A494. Mr. Suarez was assigned a "1-S" designation: a mental-health service level that is reserved for patients with the most serious mental-health diagnoses and needs. A478; A1965. As of January 2018, less than 5% of people in New York's corrections system had been classified as Level 1-S. A864.

On June 30, 2017, Mr. Suarez met with defendant Dr. Abdul Qayyum, an OMH psychiatrist. Qayyum documented Mr. Suarez's schizoaffective disorder and history of hearing voices. A561. As he had before, Mr. Suarez expressed the belief that he felt "normal" and "fine," and did not "feel like [he] need[ed] medication." A380; A561 (Qayyum noting in file that Mr. Suarez said he "didn't need meds"). But unlike Mr. Suarez's prior treatment providers—who recognized that this mistaken belief was a product of his mental illness—Qayyum accepted Mr. Suarez's statement without inquiry, telling him: "[O]kay. We are going to try it then." A380. Qayyum thus discontinued Mr. Suarez's antipsychotic prescription. A562. He did so despite his understanding that "some people believe they do not need medication, but once they stop taking it they begin to decompensate." A446.

OMH policy requires that clinicians "[d]ocument the discussion of the risks and benefits of medication (medication education) with the patient," as well as "the patient's response to the discussion and apparent level of understanding." A867.

8

Although Qayyum checked a box on his notes indicating that he had provided "medication education," no such education, much less Mr. Suarez's response and understanding to it, is described in his notes. A561-64. And Mr. Suarez asserted "that no one at Downstate educated him regarding the critical importance of remaining on his medication in order to maintain his psychiatric stability." A888 (recounting interview with Mr. Suarez).

A few days later, on July 5, Qayyum signed a mental-illness-designation form that described in further detail Mr. Suarez's history of auditory hallucinations encouraging self-harm and his suicide attempt. A480. At some point after his June 30 meeting with Mr. Suarez, Qayyum also learned of Mr. Suarez's history of prior psychiatric hospitalizations. A446. Yet Qayyum decided not to schedule an earlier follow-up appointment, despite having discontinued Mr. Suarez's medication. A1646.

No treatment provider checked in on the now-unmedicated Mr. Suarez for three weeks, until a July 19 appointment with Kulick. In her notes, Kulick repeated her prior observation that Mr. Suarez believes medication is "effective in treating his psychiatric symptoms." A481. Yet when she learned that Qayyum had discontinued his medication weeks before, she provided no medication education, as OMH policy requires. A481-85; A816-17; A1524. Qayyum's July 21 visit with Mr. Suarez was

9

similar: while he checked a box regarding medication education, he provided no description of it or Mr. Suarez's reaction to it. A564.

Overall, in the six weeks after Qayyum abruptly discontinued Mr. Suarez's antipsychotic medication, Mr. Suarez's mental-health treatment consisted of just two fifteen-minute meetings. A1987.

### 3. *After Mr. Suarez starts decompensating, he is placed in solitary confinement and left without meaningful care for two weeks*

Predictably, Mr. Suarez began decompensating once he was not "tak[ing his] medication," experiencing paranoia and hearing "voices." A892-893; A381; *see* A1378 (Kirby report recounting Mr. Suarez's decompensation). The voices told him he had to "protect" himself or else somebody close to him would "try to harm" him. A371. Mr. Suarez's aggressive episodes resurfaced—just as they had in previous instances when Mr. Suarez was off his medication. *Supra* pp.5-6. On August 8, he verbally threatened several corrections officers and kicked one in the knee without provocation. A343.

Mr. Suarez was transported to Downstate's infirmary immediately after the altercation. There, he was placed in a spit mask after spitting at infirmary staff; staff also reported that he was lethargic and had the date off by two days. A652; A1994. Infirmary staff made a referral to Downstate's mental-health clinicians, observing in the referral form that Mr. Suarez had been off his medication for over a month.

10

A652.  Kulick arrived just ten minutes after the referral.  Yet she reported that Mr. Suarez was "oriented to time, place, and person," and despite seeing him in a spit mask, she stated that he "appear[ed] calm."  A1530.  Even though Kulick knew Mr. Suarez had been deprived of medication for weeks, had repeatedly noted the necessity of that medication, and had access to medical records warning of Mr. Suarez's decompensation without medication, she did not request any information from Downstate staff about the nature of the disciplinary incident.  A972.

Mr. Suarez was automatically placed in solitary confinement (SHU) pending his disciplinary hearing.  In his "small cell" in SHU, he had no access to reading or writing materials.  A871.  For the first week, he was also subjected to a deprivation order due to unspecified but continued "negative behavior" (which, according to defendants, can include all manner of violent behavior).  A1061.[3]  Under that deprivation order, Mr. Suarez was not permitted phone calls, visitors (including his mother who unsuccessfully tried to visit), or to leave the cell for any reason other than a shower once a week.  A382; A953; A1784.  OMH receives copies of all deprivation orders.  A948.

---

[3] Specifically, a defendant stated that "negative behavior" could include spitting, yelling, assault, "throw[ing] feces at people," and other violent conduct. A1075.

While Mr. Suarez was confined to his cell (and without medication), he continued "hearing voices" telling him that someone close to him would harm him. A383. He assumed the one to harm him would be his mother. A383. Unsurprisingly, Mr. Suarez's lack of insight into his mental state precluded him from reporting these symptoms. A383 (testifying that at the time he didn't think the voices "were going to be there for a while" and "didn't think they were going to bother me that much"). Looking back, Mr. Suarez observed that he "was not in the right state of mind to think of" asking for help. A383. Mr. Suarez also suffered "anxiety attacks" in SHU; he "was really trying to keep [him]self together but [] felt [] too overwhelmed." A383. According to Mr. Suarez, no clinician came to speak to him during the two weeks he was in SHU. A383.

Defendant Maura DiNardo, an OMH psychologist, became Mr. Suarez's primary clinician once he was placed in SHU. As her screening form upon Mr. Suarez's admission observes, she was aware of his inpatient and outpatient psychiatric history. A1533. And as with the other OMH clinicians, *see supra* p.7, there is evidence that DiNardo had access to Mr. Suarez's medical records from Kirby warning of Mr. Suarez's history of noncompliance and decompensation without medication. DiNardo, along with all OMH staff, had the authority to transfer Mr. Suarez from SHU to a monitored mental-health unit in Downstate where he would receive daily treatment. A333; A865.

Mr. Suarez nonetheless remained in SHU and received no mental-health treatment while confined there. DiNardo attested that her only contact with Mr. Suarez consisted of daily "attempt[s] to communicate" through the door of his cell, which might not have lasted more than "a couple of minutes"; on some days, all she did "was say hi" to him. A414; A1004. Although DiNardo was in charge of Mr. Suarez's care during that period, she never investigated what "negative behavior" had warranted his week-long deprivation order. A894-95.

### 4. While Mr. Suarez remains in solitary confinement, defendants confirm his history of noncompliance and attest that he will decompensate without medication

While Mr. Suarez remained in solitary confinement, multiple defendants learned more information about his history of noncompliance with medication and the severity of his mental illness. Yet they did nothing to treat Mr. Suarez or accelerate his removal from solitary confinement.

At some point in August, OMH began the process of petitioning for an assisted-outpatient-treatment (AOT) order upon Mr. Suarez's release. An AOT order requires a newly released individual to "comply with their outpatient treatment, including attending appointments and taking medication, if recommended." A456. It is designed for those who have a history of noncompliance with medication and are "at some risk of decompensation or harm without [an] AOT being in place." A455.

13

In connection with the AOT petition, an OMH official sent an email on August 11 to Dr. Qayyum and other defendants. That email described Mr. Suarez's past "hospitalizations following noncompliance with treatment." A1535. It also attached Mr. Suarez's discharge summary from Kirby, which, as noted above, described Mr. Suarez's noncompliance and warned Mr. Suarez's "[a]ccepting facility to encourage medication compliance as patient will decompensate if non-compliant" (A1535-37).

Two defendants submitted affirmations in support of the AOT petition: Robert Morton, the superintendent of Downstate; and Dr. Brandon Reynolds, a state-employed psychiatrist. On August 21, Morton attested that an AOT order was warranted because of Mr. Suarez's "history of lack of compliance with treatment for mental illness that" had "resulted in one or more acts of serious violent behavior." A514-15. He noted the "risk" of Mr. Suarez's future violent behavior without "court-ordered treatment." A516.

On August 25, Dr. Reynolds, who had examined Mr. Suarez on August 17, attested similarly. He noted that when Mr. Suarez was noncompliant with medication, as he had a history of being, he experienced "hallucinations" and had a "history of violence." A520. In Reynolds' words:

> The patient has a noted history of non-compliance with psychiatric treatment and medication, which has specifically resulted in a recurrence of psychiatric instability with suicidal thoughts and threats, relapse on illegal drugs, hospitalizations and incarceration. There is nothing to indicate that he will change his pattern of

14

> treatment non-compliance and respond without the benefit
> of court ordered outpatient treatment.

A521.  Reynolds opined that Mr. Suarez's lack of medication likely caused the disciplinary incident for which he was confined in SHU.  A520-21 (noting Suarez had been off medication for five weeks before incident).  During his meetings with Mr. Suarez, Reynolds also observed that Mr. Suarez had "poor" insight into his mental condition and inappropriate smiling and laughter (A456; A504)—signs of hallucinations (A1374; A1446).  And he noted that Mr. Suarez "does not believe he has any mental illnesses."  A504.

Defendant Chesney Baker, an OMH social worker who was responsible for ensuring Mr. Suarez received mental-health services after his release, similarly observed that Mr. Suarez had "poor" insight and judgment when she met with him during this period.  A464.  As Baker later elaborated, a patient with "poor" insight or judgment "doesn't have any insight into what his mental health is."  A1023.  Baker likewise understood that part of what qualified Mr. Suarez for an AOT order was his "history of noncompliance and psychiatric decompensation … and subsequent violence."  A1048-49.  Despite being part of Mr. Suarez's treatment team, neither Reynolds nor Baker took any action to mitigate the risk of Mr. Suarez's further decompensation while at Downstate.

**5.  *Defendants recognize the need to divert Mr. Suarez from SHU in light of his mental illness yet sentence Mr. Suarez to keeplock confinement***

Other defendants observed similar signs of Mr. Suarez's decompensation. Defendant Peter Horan, a DOCCS hearing officer, conducted Mr. Suarez's disciplinary hearing in August. At the hearing, Mr. Suarez expressed a lack of understanding as to why he was there, did not agree he was under OMH treatment, and did not believe he had a mental illness. A1542-43. He also appeared to be confused about whether he was taking medication. A1547 (incorrectly stating, "I take medicine"). Mr. Suarez's deterioration was so obvious that Horan observed—despite having no medical training—that Mr. Suarez exhibited "signs of mental illness" and a "lack of connection." A1067; A1166. Horan also believed that Mr. Suarez's mental illness had caused his misconduct, opining that Mr. Suarez "got off the rails" and "did something wrong to an officer." A1067; A1166. DiNardo agreed. She testified to Horan that Mr. Suarez's misconduct was "related to" his "mental health symptoms," and that in her opinion, Mr. Suarez was "not suitable for confinement in disciplinary housing due to the mental illness." A1166.

On August 22, Horan found Mr. Suarez guilty. Despite DiNardo's advice, he sentenced Mr. Suarez to further disciplinary confinement: 60 days in keeplock, with 30 of those days suspended for 180 days. A341. In keeplock, Mr. Suarez was confined to his general-population cell, alone, for 23 hours a day. A1065; A362;

16

A873.  Morton was required to sign off on this sentence because Mr. Suarez's "mental health was at issue" and because the "confinement sanction" exceeded 30 days.  A356.  He approved it without comment.

### 6. Mr. Suarez is released after enduring months without medication and therapy and attacks his mother during a psychotic episode

Mr. Suarez continued to deteriorate in keeplock, still with no medication or treatment.  On August 24, Qayyum observed that he was laughing "inappropriately." A447; A1163.   A day later, Reynolds observed the same, plus Mr. Suarez's continued "poor" insight into his mental condition.  A506.  Reynolds also noted that Mr. Suarez's being deprived of medication—which Reynolds inaccurately described as "non-compliance," despite knowing Qayyum had discontinued the prescription— "increase[d]" his "risk" of suicide.  A506.  Neither clinician took any action.  A court issued Mr. Suarez's AOT order on August 31, which called for daily medication and ongoing treatment upon Mr. Suarez's release.  A1253-58; A1526.

On September 2, Mr. Suarez's mother and sister visited him.  They saw that he was talking to himself and "unable to carry a conversation"; he also vomited during the visit.  A793; A824.  They told DOCCS officials in the room that Mr. Suarez "needed help" and asked for him to see a doctor; the officials told them that no medical assistance was available because of the Labor Day holiday.  A794.

Mr. Suarez was released on September 5 into his mother's care. That evening, his mother observed him pacing, giggling, carrying on conversations by himself, and appearing angry and nonsensical. A2034. The next day, Mr. Suarez heard voices telling him that his mother was going to hurt him. A388. He succumbed to those voices and stabbed his mother multiple times in the chest, seriously injuring her. A388. The District Attorney consented to a not-guilty-by-reason-of-insanity plea. A837; A1383. Mr. Suarez was committed yet again to Kirby, where he remains today. A1380.

At Kirby, Mr. Suarez initially "continued to demonstrate poor insight into his mental illness and his need for medication." A1380-84. After continued medication education and therapy, however, he now understands that he "need[s] to take medication to treat [his] mental illness," even if he feels that he has been "healed." A390; A370; A378. Mr. Suarez feels that medication and therapy have improved his ability to accurately report on his mental state. A391-92.

## B.    Procedural History

Mr. Suarez brought Eighth Amendment claims against the mental-health professionals who had purported to treat him at Downstate (Qayyum, Kulick, DiNardo, Reynolds, and Baker, collectively, "treating defendants"), as well as the DOCCS officials who held him in SHU and keeplock confinement (Horan and Morton, collectively, "DOCCS defendants"). Mr. Suarez alleged that defendants

18

caused his mental decompensation by depriving him of necessary medication, medication education, and therapy; and by failing to divert him from solitary confinement despite his clear mental-health needs.[4]

Defendants moved for summary judgment. For purposes of Mr. Suarez's Eighth Amendment claims, they did not contest the objective component of Mr. Suarez's claims claims—*i.e.*, that he had suffered a sufficiently serious deprivation of medical care and had endured inhumane conditions of confinement. SPA25. Defendants argued only that Mr. Suarez had failed to show defendants' subjective deliberate indifference to the risk of that harm. They contended they could not have known Mr. Suarez was decompensating, largely because Mr. Suarez did not tell anyone he was suffering from hallucinations and required medical care. In other words, as defendants' expert opined, defendants could not be liable because Mr. Suarez "had no real interest in mental health treatment." A436. According to defendants, Mr. Suarez had simply refused medication at Downstate. Defendants took this position even though Qayyum himself attested that *he* had made the choice

_____

[4] In a separate lawsuit, Mr. Suarez's mother brought Fourteenth Amendment claims against several of the same defendants—Morton, Horan, and Baker— alleging they "recklessly increased the risk of Mr. Suarez's mental decompensation and psychotic episode, and, by extension, recklessly increased the risk that Mr. S[ua]rez would injure" her. The district court denied those defendants' motion for summary judgment in Mr. Suarez's mother's case. *Idiakheua v. Morton*, No. 20-cv-04169 (E.D.N.Y. Feb. 5, 2024).

to discontinue Mr. Suarez's prescription, and that "at no time did [Mr. Suarez] refuse to take prescribed medication." A446. Defendants' expert also opined that Mr. Suarez "turn[ed] his mental health symptoms on and off whenever it [was] convenient," and that his stabbing his mother was "unrelated to alleged psychotic symptoms." A437-41.

In opposing summary judgment, Mr. Suarez submitted evidence that his risk of decompensation was known to all defendants during the months they refused to provide him with adequate treatment. *See supra* pp.6-17. He also submitted the expert report of Dr. Stuart Grassian, which explained how defendants' purported "treatment" of Mr. Suarez was grossly inadequate, and how placing Mr. Suarez in "solitary confinement caused him grave psychological harm, which could and should have been anticipated at the time." A1444-45.

The district court granted summary judgment on Mr. Suarez's Eighth Amendment claims. The court concluded that the question of defendants' deliberate indifference turned on whether defendants knew Mr. Suarez was at risk of serious harm in the form of his psychological decompensation. SPA26. The court ruled that defendants lacked such knowledge as a matter of law.

Discussing the treating defendants' knowledge, the court placed great reliance on the fact that Mr. Suarez had not told anyone that he was hearing voices—what the court deemed "the distinct symptom of plaintiff's decompensation." SPA30.

20

The court also concluded that the symptoms of decompensation the treating defendants *did* observe "could not be considered in isolation," and weighed that evidence against evidence favoring defendants. SPA20-31. The court did not discuss defendants' awareness of Mr. Suarez's psychiatric history and of the warnings from prior facilities about his history of non-compliance and risk of decompensation without medication.

The court similarly ruled that the DOCCS defendants did not display deliberate indifference. As to Morton, the court reasoned that although his petitioning for an AOT order showed he "was aware of plaintiff's risk of decompensation," it also showed he "acted to protect plaintiff from harm," SPA27—even though the AOT order did nothing to provide Mr. Suarez treatment while he was at Downstate. Similarly, the court concluded that Horan's decision to sentence Suarez to keeplock confinement, even after receiving medical advice that his serious mental illness made him unsuitable for any disciplinary confinement (in whatever form), could be interpreted only as a "subjective intent to reduce plaintiff's risk of harm." SPA29.[5]

---

[5] The district court noted that some statements in Mr. Suarez's Rule 56.1 submissions contained erroneous citations. SPA2-3. For the avoidance of doubt, this brief relies only on properly submitted summary-judgment exhibits supporting each factual assertion or on defendants' admissions of undisputed facts.

## SUMMARY OF ARGUMENT

The district court erred in granting summary judgment on Mr. Suarez's Eighth Amendment claims. The only question on appeal is whether there is a triable issue on defendants' subjective deliberate indifference. There is. During the entire time Mr. Suarez was held at Downstate, defendants knew of at least a significant risk that Mr. Suarez would decompensate without meaningful mental-health treatment and in harmful conditions of confinement—yet failed to effectively address that risk.

**A.** As this Court and other circuits have held, prison officials may exhibit deliberate indifference under two circumstances. The first is when officials fail to offer adequate medical care, including by ignoring treating-physician medical advice and by discontinuing prescribed treatment, including mental-health treatment, without adequately considering a patient's history and risk factors. The second is when officials place individuals with mental illness in harmful conditions of confinement while knowing the risk that those conditions will harm the individual's mental state. *See infra* Part A.1.

Both those circumstances are present here. Ample evidence shows that each defendant knew—from medical records, direct observation, training and experience, or other defendants' statements—that Mr. Suarez would very likely decompensate without medication or meaningful treatment, especially in solitary and keeplock confinement. Particularly in light of defendants' training and experience and

22

training, a jury could reasonably infer that the risk of harm to Mr. Suarez in that situation was sufficiently obvious such that defendants must have known about it. Compounding that obviousness, multiple defendants saw and recorded symptoms of Mr. Suarez's *actual* decompensation, including acts of aggression, indicia of hallucinations, and failure to understand his own mental state. Yet no defendant took effective action to ameliorate that risk, whether by providing or referring additional treatment or removing him from solitary or keeplock confinement. *See infra* Part A.2.

**B.** The district court rejected this evidence based primarily on one fact: Mr. Suarez did not advertise his hallucinations to defendants. That contravenes basic Eighth-Amendment and summary-judgment principles. *See infra* Part B. Direct evidence of defendants' knowledge is not required—much less direct evidence in the form of Mr. Suarez's admissions of decompensation. To the contrary, it is well-settled that circumstantial evidence, including the obviousness of a risk, supports an inference of knowledge. That is particularly true here, where the record shows that defendants knew Mr. Suarez might not understand or accurately self-report his mental-health symptoms and needs. Were that not enough, significant evidence (both direct and circumstantial) demonstrates that defendants knew about other warnings of Mr. Suarez's imminent or actual decompensation, regardless of his failure to inform defendants of his hallucinations. In brushing those facts aside, the

court wrongly weighed the disputed evidence in defendants' favor. Finally, to the extent the district court acknowledged that some defendants knew of the risks Mr. Suarez faced, it erred in concluding that defendants' patently ineffective actions absolved them of any wrongdoing. Its judgment should be reversed.

## STANDARD OF REVIEW

This Court reviews a "grant of summary judgment *de novo*, construing the facts in the light most favorable to the plaintiff and resolving all ambiguities and drawing all reasonable inferences against the defendants." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005). Summary judgment is appropriate only if there is no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

## ARGUMENT

## A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANTS WERE DELIBERATELY INDIFFERENT TO A SIGNIFICANT RISK TO MR. SUAREZ'S MENTAL HEALTH

Defendants violated Mr. Suarez's Eighth Amendment rights in two interrelated ways: by failing to provide him with adequate mental-health care, and by placing him in harmful conditions of confinement. For purposes of summary judgment, defendants conceded that Mr. Suarez satisfied the objective component of his claims: that is, that he suffered a sufficiently serious deprivation of medical

care and inhumane conditions of confinement. SPA24. The only question on appeal is whether Mr. Suarez raised a triable issue on defendants' deliberate indifference to a significant risk that those actions would harm Mr. Suarez.

Deliberate indifference requires that defendants "know of, and disregard, an excessive risk to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013); *see Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). Those risks include risks to a plaintiff's mental health, because it is "plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care." *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989). The deliberate-indifference standard is akin to "recklessness." *Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence" such as evidence that "the risk was obvious." *Id.* at 842. "[A] medical condition is not required to be obvious to a layman" to be obvious to a defendant; to the contrary, a defendant's particular "knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial risk." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) (discussing medical professionals' heightened knowledge). That principle applies to corrections officers as well as healthcare professionals. *See Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019), *as amended* (given defendants' "status as corrections

25

professionals, it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction … could cause"). In other words, the question of obviousness asks what a defendant must have known given their particular background and experience.

Under those standards, there is a triable issue on each defendant's deliberate indifference.

## A. A Triable Issue Exists On Defendants' Deliberate Indifference

### 1. *Prison officials may display deliberate indifference by ignoring medical-treatment advice, providing ineffective treatment, and subjecting individuals with serious mental illness to harmful conditions of confinement*

This Court and other circuits have held that a plaintiff may establish deliberate indifference when prison officials do what defendants did here: ignore a patient's medical-treatment advice and fail to provide any effective treatment (including mental-health treatment); and/or subject an individual with serious mental illness to harmful conditions of confinement despite known risk factors.

1. "[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians." *Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005). Thus, in *Johnson*, this Court held that a jury could infer that defendant prison officials, including a DOCCS physician, "subjectively kn[e]w of, and disregard[ed]," an "excessive risk" to the plaintiff's health when they denied him Hepatitis C medication that "plaintiff's

treating physicians" had deemed "the medically appropriate course of treatment." *Id.* The Court acknowledged evidence in the record that the alternative medication defendants had provided was medically justifiable—but concluded that this simply created an issue for a factfinder. *See id.* Nor was it enough that defendants' alternative treatment plan adhered to prison guidelines: the Court explained that a jury could find this "reflexive" reliance on policy unjustified in the face of contrary medical advice. *Id.* at 404-06.

Other courts have applied the same reasoning. In *Miller v. Schoenen*, an incarcerated plaintiff "needed specialized care" for a heart condition, as documented in his treatment notes, yet a prison doctor denied that treatment. 75 F.3d 1305, 1310 (8th Cir. 1996). The Eighth Circuit affirmed the denial of summary judgment because "a jury could infer that" the doctor was "familiar with" those notes and displayed deliberate indifference by ignoring their instructions. *Id.* And in *Hunt v. Uphoff*, the Tenth Circuit allowed a deliberate-indifference claim to proceed when plaintiff alleged "he was denied insulin by a doctor even though it had been earlier prescribed for him by another prison doctor"; the court rejected the notion that this action constituted a "mere disagreement as to his medical treatment." 199 F.3d 1220, 1223-24 (10th Cir. 1999).

The same is true when it comes to mental-health conditions. In *Steele v. Shah*, the Eleventh Circuit held that a fact issue on deliberate indifference existed when

plaintiff produced evidence that a prison doctor discontinued his psychotropic medication "on the basis of one cursory interview and without having reviewed any medical records beyond the treatment plan," and failed to reconsider that decision even after learning the patient was a "potential suicide risk." 87 F.3d 1266, 1269 (11th Cir. 1996), *as amended*. On those facts, a jury could find the doctor "knew of a substantial risk from the very fact that the risk was obvious," yet "deliberately disregarded it." *Id.* The Eleventh Circuit relied on its earlier precedent, *Greason v. Kemp*: there, the court similarly held that a plaintiff presented sufficient evidence of deliberate indifference when a prison doctor discontinued his mental-health medication, despite available records disclosing that the plaintiff "was a schizophrenic with an extensive history of mental illness and numerous hospital admissions for psychiatric treatment." 891 F.2d 829, 835 (11th Cir. 1990).

These cases illustrate a simple principle: depriving a plaintiff of an advised course of treatment, including mental-health treatment, can constitute deliberate indifference. And even when a "plaintiff is receiving some form of treatment" from the defendant, "deliberate indifference can be established through evidence the defendant knew the course of treatment was largely ineffective, and declined to do anything more to attempt to improve the plaintiff's situation." *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994); *accord Williams v. Vincent*, 508 F.2d 541,

28

544 (2d Cir. 1974) (an "easier and less efficacious" treatment plan can constitute deliberate indifference).

Here, a jury could readily infer that defendants knew of, and disregarded, a substantial risk that Mr. Suarez would decompensate without medication or any other meaningful mental-health treatment. As explained further below, each defendant either received records disclosing that Mr. Suarez had a history of medication noncompliance and would decompensate without medication; independently knew of a risk Mr. Suarez would decompensate without medication; and/or documented signs of Mr. Suarez's actual decompensation. Indeed, Mr. Suarez's decompensation was so obvious that it was apparent to laypeople, raising a strong inference that defendants similarly witnessed it. A793; A824 (Mr. Suarez's mother and sister observing that Mr. Suarez was talking to himself and unable to conduct conversation). Yet despite this knowledge, no defendant took any effective action to mitigate those harms, whether through reinstating Mr. Suarez's prescription, providing medication education—which was required by Downstate policy—making mental-health referrals, or otherwise. That inaction persisted even as some defendants petitioned for (and obtained) a court order requiring Mr. Suarez to take prescribed medication. In obtaining that order, those defendants attested that Mr. Suarez would not comply with such treatment and would decompensate without it. *See infra* Part A.2.

**2.**  Prison officials' deliberate indifference may also be established when they place a person with serious mental illness in harmful conditions of confinement, including isolated confinement.  It is "increasingly obvious" that "extended stays in solitary confinement can cause serious damage to mental health."  *Palakovic v. Wetzel*, 854 F.3d 209, 226 (3d Cir. 2017) (collecting cases); *see also Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015) (considering conditions-of-confinement claim under similar due-process framework).  The record here reflects that reality.  As Mr. Suarez showed, years of research have produced a "scientific consensus on the significant risk of serious psychological harm imposed by solitary confinement."  A1124; *see generally* A1111-1139; 1176-1247 (research documenting dangers of solitary confinement).  Mr. Suarez's medical expert Dr. Grassian also detailed how isolated confinement causes severe mental illness, including "illusions and hallucinations."  A877-82 (Grassian report).  Courts have concluded that this "extensive scholarly literature describing and quantifying the adverse mental health effects of prolonged solitary confinement" can "provide[] circumstantial evidence that the risk of such harm was so obvious that it had to have been known" by prison officials who place individuals in such confinement.  *Porter*, 923 F.3d at 361 (upholding judgment for plaintiffs on Eighth Amendment claim challenging conditions "akin" to solitary confinement).  Indeed, Downstate's own policies reflect understanding of this obvious risk:  DOCCS must complete suicide prevention

screening guides for every individual who is placed in SHU to determine whether an immediate referral to OMH is required.  A360-61.

And, as particularly relevant here, medical and scientific communities are in "widespread agreement" that "solitary confinement should never be used for certain vulnerable groups of prisoners," including "mentally ill individuals."  A1127.  Dr. Grassian explained that individuals with mental illness subject to solitary confinement "more readily become symptomatic" and "become more severely symptomatic."  A881.  "When a mentally ill individual who is prone to reality distortions—paranoia and delusional thinking—is kept in a stressful environment such as solitary confinement, there is a great danger that the delusions will become fixed, systematized and increasingly elaborated—to the point that he is no longer amenable to change."  A881.  Courts have adopted that understanding:  when "officials kn[o]w the risks the SHU posed to [a plaintiff] as a mentally ill inmate but d[o] not respond reasonably to ensure his safety," it constitutes an "unexplained inaction in the face of a known risk [that] has long been held violative of the Eighth Amendment."  *Clark v. Coupe*, 55 F.4th 167, 184 (3d Cir. 2022).

Here, a jury could readily infer that defendants knew of, and disregarded, the substantial risk that holding Mr. Suarez in SHU and keeplock would cause or exacerbate his decompensation.  There is no dispute that all defendants knew Mr. Suarez was seriously mentally ill.  And given their "status as corrections

31

professionals"—plus, in some cases, mental-health professionals—"it would defy logic to suggest that they were unaware of the potential harm that the lack of human interaction" in SHU and keeplock "could cause" Mr. Suarez. *Porter*, 923 F.3d at 361. Indeed, as explained further below, defendants knew the risks that solitary and keeplock confinement posed to Mr. Suarez, with some defendants going so far as to advise others that he should not be kept in such disciplinary housing. Yet defendants allowed him to remain in those conditions, without meaningful medical care, for weeks. That is sufficient evidence to raise a triable issue on defendants' deliberate indifference as well. *See infra* Part A.2.

> **2.** **Each defendant knew of the risk Mr. Suarez would decompensate without treatment and in solitary or keeplock confinement—or that Mr. Suarez was actually decompensating—yet took no effective action to mitigate that risk**

Applying these principles, the record establishes that each defendant exhibited deliberate indifference to a significant risk of harm to Mr. Suarez.

### i. Treating defendants

*Qayyum.* Dr. Qayyum, Mr. Suarez's treating psychiatrist, admitted knowing that individuals with mental illness could decompensate when taken off medication and confined in SHU. He knew that risk was particularly acute for Mr. Suarez, given the medical history contained in his treatment records. And he saw signs of Mr. Suarez's actual decompensation. Despite that knowledge, he took Mr. Suarez off

32

his medication, failed to provide any effective treatment (including required medication education), and allowed him to remain in harmful conditions of confinement.

On Qayyum's first visit with Mr. Suarez, he documented his severe diagnosis and history of hallucinations. A561. Yet he discontinued Mr. Suarez's prescribed antipsychotic medication based solely on Mr. Suarez's statement that he was "fine." A380. Qayyum did so despite knowing that "some people believe they do not need medication, but once they stop taking it they begin to decompensate." A446. He did not revisit that decision even after learning that Mr. Suarez had a history of psychiatric hospitalizations and suicide attempts. A480; A446.

Compounding that knowledge, Qayyum also had access to the Kirby discharge summary documenting Mr. Suarez's specific history of noncompliance and instructing facilities to "encourage medication compliance as [Mr. Suarez] will decompensate if non-compliant." A1448; *see* A967-68 (defendants not denying that Kirby documents were available to Downstate OMH staff upon Mr. Suarez's admission). That supports the inference that Qayyum—and all other treating defendants—knew of that warning. *Scinto v. Stansberry*, 841 F.3d 219, 229 (4th Cir. 2016) (knowledge can be inferred when a condition is "longstanding, pervasive, well-documented, [and] expressly noted," and "the circumstances suggest that the defendant-official ... had been exposed to information concerning the risk and thus

must have known about it" (quotation marks omitted); *Steele*, 87 F.3d at 1269. Yet for weeks, Qayyum failed to second-guess his discontinuance of medication, or even check on Mr. Suarez.

In the following month, Qayyum failed to divert Mr. Suarez from SHU (as he had authority to do) even though he undisputedly learned on August 11 of Kirby's warning that Mr. Suarez would "decompensate if non-compliant" (A1448); knew that placement in SHU could increase the risk of decompensation (A1650); and knew that violent behavior like that underlying Mr. Suarez's disciplinary incident could be a sign of decompensation (A888; A1997). And when faced with evidence of Mr. Suarez's actual decompensation in August 24 in the form of "inappropriate[]" smiling and laughter (A447; A1550)—symptoms that indicate hallucinations (A1374; A1446)—Qayyum still did nothing.

A jury could readily infer from this evidence that Qayyum knew of a substantial risk to Mr. Suarez's mental state and disregarded that risk by failing to treat him at all. *See, e.g.*, *Greason*, 891 F.2d at 835; *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) (decision to "refus[e] treatment of a properly diagnosed condition" constitutes deliberate indifference). Qayyum not only discontinued Mr. Suarez's prescription, but failed to substitute it with any effective treatment, like medication education or individualized therapy. A561-64; A564; A887 (Qayyum's notes failing to document the content of his medication education or Mr. Suarez's

34

understanding of it). In doing so, Qayyum ignored both treating physicians' instructions and OMH policy—both of which support an inference of deliberate indifference to a known risk. *Johnson*, 412 F.3d at 404-06 (ignoring treatment advice); *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541 (6th Cir. 2000) (violating policy). Indeed, the risk of harm that Qayyum's actions created was so obvious that his own supervisor admitted it: Ryan Lahey, Downstate's seniormost OMH official, later testified that if he had learned "a psychiatrist had taken someone off their meds and that the primary clinician wasn't told for weeks," he would have felt the "need to address" that situation. A977.

To the extent Qayyum followed *any* treatment plan, it was limited to his "routine" of weeks between cursory mental-health appointments. A1646. But as this Court has explained, such "reflexive[]" reliance on policy can *show* deliberate indifference. *Johnson*, 412 F.3d at 406. Indeed, on defendants' own logic, this treatment plan was "largely ineffective." *Hathaway*, 37 F.3d at 68; *Williams*, 508 F.2d at 544 (ineffective treatment plans can constitute deliberate indifference). Qayyum believed it was not necessary to monitor Mr. Suarez for decompensation more frequently because he "would be notified" by DOCCS if there were any "concerns" with Mr. Suarez's behavior. A447. But, as defendants have been so quick to argue, DOCCS employees have no medical training and defer to OMH on any matters regarding mental-health treatment. *E.g.*, A358 (Morton disclaiming

35

"responsib[ility] for mental health care"); A338 (Horan stating belief that if Mr. Suarez "beg[a]n to suffer mental health issues, OMH" would take over). Defendants cannot have it both ways.

Even had defendants presented evidence that Qayyum's actions were somehow "medically justifiable," Mr. Suarez's competing evidence on that issue precludes summary judgment. *Johnson*, 412 F.3d at 404 (denying summary judgment when such "conflicting" evidence was present). Reviewing the record, Dr. Grassian concluded that Mr. Suarez's "need for antipsychotic medication was never adequately addressed" through education, he "received virtually no counseling," and the decompensation that occurred as a result was similarly ignored. A857. As to Qayyum's "wait and see if Mr. Suarez decompensates" approach to treatment, Grassian explained that this too was unjustifiable: rather, "the therapeutic effort" for patients with mental illness "must be prophylactic, an effort to prevent episodes of psychiatric decompensation." A882.

The question of Qayyum's deliberate indifference should have gone to a jury.

*Kulick.* Much like Qayyum, Kulick knew of a risk that Mr. Suarez would decompensate without medication—yet took no action when she learned that medication had been discontinued; when she witnessed signs of Mr. Suarez's decompensation; or when she learned of further risk factors, like his confinement in SHU.

Upon first meeting Mr. Suarez, Kulick documented his diagnosis and history of suicide attempts, and concluded he needed psychotropic medication. A491 (noting Mr. Suarez "endorses compliance with his medication and believes same are effective in treating his psychiatric symptoms"; recommending continued medication and therapy). Viewing the facts in Mr. Suarez's favor, Kulick also knew of the Kirby records warning of Mr. Suarez's noncompliance and potential decompensation. *Supra* p.7; *Scinto*, 841 F.3d at 229. Yet when she learned three weeks later that he had been taken off that medication, she—like Qayyum—provided no medication education, in violation of OMH policy and in contravention of Kirby's instructions to "encourage" compliance. A481-85. Nor did she attempt to monitor Mr. Suarez more closely, instead apparently adhering to Downstate's default policy under which Mr. Suarez would not been seen for another month. A1584. Her failure to offer the treatment she knew to be effective, and required, is evidence of her deliberate indifference. *Johnson*, 412 F.3d at 404-06.

Kulick took no action when confronted with evidence of Mr. Suarez's actual decompensation either. Just after Mr. Suarez exhibited aggressive behavior by kicking a corrections officer, Kulick responded to an urgent referral from Downstate's infirmary. There, she saw Mr. Suarez, who had been placed in a spit mask for spitting at staff and who moments before had been unable to identify the date. Notwithstanding her knowledge of Mr. Suarez's history of hospitalizations,

risk of decompensation without medication, and abrupt cessation of medication, Kulick asked for no information about the nature of Mr. Suarez's disciplinary incident. A972. But such incidents are a sign of decompensation, which a mental-health professional like Kulick would have known. A891; A1997; *Lucas*, 58 F.4th at 1139. That permits an inference that Kulick at least closed her eyes to the reality that Mr. Suarez was decompensating. *Farmer*, 511 U.S. at 843 n.8 (defendant disregards obvious risk by "refus[ing] to verify underlying facts that he strongly suspected to be true, or declin[ing] to confirm inferences of risk that he strongly suspected to exist").

Kulick's indifference persisted through Mr. Suarez's confinement in SHU and keeplock. Her notes confirm her understanding of the risks Mr. Suarez faced there: she noted that solitary confinement increased Mr. Suarez's risk of suicide, and that other risk factors included disciplinary sanctions and being "housed in single cell" confinement, as he was during his subsequent keeplock sanction. A897-98. At no point did Kulick speak with DiNardo; recommend referral to Downstate's mental-health unit; or take any other treatment action. The total absence of any treatment efforts makes Kulick's deliberate indifference an issue for the jury. *Harrison*, 219 F.3d at 139; *cf. Woodward v. Corr. Med. Servs.*, 368 F.3d 917 (7th Cir. 2004) (failure to respond to signs of imminent mental-health crisis is evidence of deliberate indifference).

38

*DiNardo.* DiNardo, Mr. Suarez's primary clinician after August 8, knew of all the risk factors described above. And she contemporaneously testified that Mr. Suarez should not be held in disciplinary confinement because of his mental illness. Despite that knowledge, she let him remain in SHU and keeplock for a month and failed to offer any meaningful treatment during that time.

DiNardo knew the obvious: that "placement in SHU can cause a person to decompensate." A416 (DiNardo deposition). Unsurprisingly, then, she believed that Mr. Suarez was "not suitable for confinement in disciplinary housing due to [his] mental illness." A1166 (DiNardo's testimony to Horan). DiNardo's OMH supervisor Ryan Lahey went further, opining that given Mr. Suarez's "history" and "presentation," a clinician should have "err[ed] on the side of getting him out of SHU." A1597. Moreover, the evidence shows DiNardo would have had access not just to Qayyum and Kulick's notes documenting Mr. Suarez's specific risk factors and cessation of medication, but also to the Kirby discharge summary warning of Mr. Suarez's noncompliance and that Mr. Suarez would deteriorate without medication. A967-68 (Kulick acknowledging OMH staff may have had access to discharge summary).

Despite all that knowledge, DiNardo failed to provide *any* treatment to Mr. Suarez while he was under her care—from his August 8 placement in SHU to his September 5 release into the community. Taking the evidence in Mr. Suarez's favor,

Mr. Suarez was never approached by any mental-health clinician while in SHU. A383. DiNardo also made no effort to learn more information about obvious signs of decompensation, like the disciplinary incident that had landed Mr. Suarez in SHU or the seven straight days of "negative behavior" that had justified his deprivation order. A1185. Instead, she allowed him to languish for weeks as he experienced paranoid hallucinations and anxiety attacks. A383.

Even crediting DiNardo's competing account of her interactions with Mr. Suarez—which is impermissible on summary judgment—she spent as little as a few minutes a day "say[ing] hi" to him through the door of his cell, if that. A414; A1004. As Lahey later acknowledged, such paltry efforts at communication fall short of actual treatment. A988; *accord Hathaway*, 37 F.3d at 68; *Williams*, 508 F.2d at 544. And when Mr. Suarez was moved from SHU to keeplock confinement—a type of "disciplinary housing" DiNardo had recommended *against* given his mental-health issues (A1356)—she failed to offer him effective care during the weeks he was confined there. That failure to treat, when DiNardo knew of all the risk factors Mr. Suarez faced, supports an inference of deliberate indifference. *Harrison*, 219 F.3d at 139.

<u>Reynolds and Baker.</u> Dr. Reynolds and Baker knew that Mr. Suarez would decompensate without medication and documented signs of his actual decompensation. Yet they allowed Mr. Suarez to remain without treatment at

40

Downstate and be released into the community in that condition, to devastating consequences.

Reynolds, the state-employed psychiatrist who evaluated Mr. Suarez for eligibility for an AOT order, had some of the most sophisticated understanding of all defendants of the risks Mr. Suarez faced. He affirmed in the petition for the AOT order that Mr. Suarez:

> has a noted history of non-compliance with psychiatric treatment and medication, which has specifically resulted in a recurrence of psychiatric instability with suicidal thoughts and threats, relapse on illegal drugs, hospitalizations and incarceration. There is nothing to indicate that he will change his pattern of treatment non-compliance and respond without the benefit of court ordered outpatient treatment.

A521. In evaluating Mr. Suarez for eligibility for an AOT order, Reynolds also observed that Mr. Suarez had "poor" insight—meaning he had no understanding of his mental-health status. And Reynolds documented that Mr. Suarez was already exhibiting signs of "psychiatric instability" such as inappropriate smiling, laughter, and assaulting corrections officers—the latter of which Reynolds expressly tied to Mr. Suarez's lack of medication. A456; A504; A520.

There is thus no real question Reynolds knew Mr. Suarez was decompensating without his medication, to a potentially dangerous result. Yet Reynolds never spoke to any staff at Downstate to ensure Mr. Suarez received that treatment before he was released, as he had the authority to do. A991 (Downstate OMH official testifying that Reynolds would speak to OMH staff about patients in the course of treating

41

them). His failure to protect Mr. Suarez from the very harms he predicted constitutes deliberate indifference. *Woodward*, 368 F.3d 917.[6]

So too with Baker, the OMH social worker responsible for planning Mr. Suarez's post-release medical care. She knew from reviewing Mr. Suarez's records and the AOT application materials that Mr. Suarez had been deprived of medication for months and would decompensate without that medication—including potentially by committing acts of violence. A1535-37 (Kirby records); A1048-49 (Baker testifying that what qualified Mr. Suarez for an AOT order was "a history of noncompliance and psychiatric decompensation" and "subsequent violence"). She also knew Mr. Suarez's insight was "poor"—again, meaning that he had no understanding of his mental state. A1144; A464. Yet she failed to provide Mr. Suarez with necessary treatment in the form of "interim medication and referrals" before his discharge. *See Charles v. Orange Cnty.*, 925 F.3d 73, 83 (2d Cir. 2019) (recognizing, for Fourteenth Amendment deliberate-indifference claim, that such treatment can be an essential component of in-custody care). That failure amounts to deliberate indifference.

---

[6] That Mr. Suarez's urgent need for medication was so obvious to Reynolds further supports the inference that it was similarly obvious to the other treating defendants, who had similar "knowledge and training." *See Lucas*, 58 F.4th at 1139.

That was effectively the conclusion the Ninth Circuit reached in *Wakefield v. Thompson*. There, the court held that prison officials violated the Eighth Amendment when they released an individual without providing him a supply of his prescribed psychiatric medication. 177 F.3d 1160, 1164 (9th Cir. 1999); *see Charles*, 925 F.3d at 83 (discussing *Wakefield* with approval). Considering the time that passes before a released person can find a doctor, schedule an appointment, and receive medication, the Ninth Circuit reasoned that the "failure to provide medication sufficient to cover this transitional period amounts to an abdication of [the] responsibility to provide medical care." *Id.* That principle applies with even greater force here: defendants not only released Mr. Suarez without even a prescription for the antipsychotic medication he undisputedly needed, but failed to provide him with such medication while he was in their care. The AOT order did nothing to protect Mr. Suarez from mental deterioration and accompanying harms before he could obtain that treatment—as the facts here show.

### ii. DOCCS defendants

*Morton and Horan.* In seeking summary judgment, the DOCCS defendants— Morton and Horan—contended that their lack of mental-health training absolved them for any action or inaction, be it subjecting Mr. Suarez to solitary and keeplock confinement, failing to refer him for treatment, or otherwise. That defense founders on the record. Morton and Horan were indisputably aware not just of Mr. Suarez's

serious mental-health issues, but of his imminent decompensation. That knowledge elevates their actions (or lack thereof) from ignorance to deliberate indifference.

Horan subjected Mr. Suarez to conditions of confinement that he knew would harm his mental state. Before imposing a sentence for Mr. Suarez's disciplinary offenses, Horan took testimony from DiNardo, who informed him that Mr. Suarez should be removed from "disciplinary housing" due to his mental-health issues. A1116. In response, Horan placed Mr. Suarez in keeplock confinement for a month. But keeplock is still "disciplinary housing." A333 (one possible disciplinary "sanction" is "keeplock confinement"); A341 (sentencing Mr. Suarez to keeplock for charged offenses). That means Horan simply ignored DiNardo's treatment advice. Indeed, keeplock is just solitary confinement by another name. In keeplock, Mr. Suarez was confined in his cell for "23 … hours a day alone," with "no access to congregate religious, educational, or social programming." *Porter*, 923 F.3d at 357; *see* A874; A1074 (describing these keeplock conditions). As Dr. Grassian explained, keeplock was thus "only marginally better than SHU" for Mr. Suarez. A983. Unsurprisingly, courts have concluded that similar conditions to those Mr. Suarez experienced in keeplock pose a "substantial risk of serious psychological and emotional harm"—and that defendants who subject inmates to those conditions knowing of their risks thus violate the Eighth Amendment. *Porter*, 923 F.3d at 357.

In ignoring treatment advice and subjecting Mr. Suarez to equally harmful conditions, Horan demonstrated deliberate difference. *Johnson*, 412 F.3d at 404-06.

Morton had even more detailed knowledge of Mr. Suarez's precarious mental-health state than Horan did.  In petitioning for the AOT order, Morton attested on August 21 that Mr. Suarez should be subject to court-ordered treatment because his "history of lack of compliance with treatment for mental illness" had "resulted in one or more acts of serious violent behavior" and psychosis.  And Morton recognized the "risk" of future violent behavior without "court-ordered treatment."  A514-16. Morton thus knew Mr. Suarez was facing imminent decompensation at Downstate, and needed treatment he was not receiving.  Yet Morton failed to refer Mr. Suarez for treatment or remove him from SHU—despite his authority to do so (A335; A356; A945).  That the AOT order would have *eventually* secured Mr. Suarez's necessary treatment does not excuse Morton's delay in providing it.  *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (unjustified delay in treatment constitutes deliberate indifference).  Worse still, Morton approved the sanction that subjected Mr. Suarez to 30 days of keeplock, conditions that would obviously exacerbate his decompensation.  A356; *supra* p.44.  Morton's forcing Mr. Suarez into the very conditions he had sworn to a court would cause Mr. Suarez harm is sufficient evidence of his deliberate indifference.

45

**B.** **In Concluding Defendants Were Not Deliberately Indifferent, The District Court Misconstrued The Deliberate-Indifference Standard And Improperly Weighed Facts In Defendants' Favor**

The district court nevertheless ruled that there was no triable issue on defendants' deliberate indifference. In so concluding, the court lost sight of the deliberate-indifference standard and improperly weighed the evidence in defendants' favor.

### 1. *Treating defendants*

**i.** **Contrary to the district court's reasoning, Mr. Suarez did not need to inform defendants of his decompensation for defendants to be aware of such a risk**

The district court concluded that treating defendants could not have known Mr. Suarez "was decompensating" or at risk for doing so, largely because Mr. Suarez "did not tell anyone at Downstate he was hearing voices." SPA26; SPA30. In demanding direct evidence of defendants' knowledge—in the form of an admission from Mr. Suarez, no less—the court overlooked a key aspect of the deliberate-indifference standard: knowledge may be inferred through circumstantial evidence that a risk was "obvious." The risk was obvious here, notwithstanding Mr. Suarez's failure to advertise his own decompensation.

It has been understood for decades that a person suffering from mental illness often cannot "acknowledge his illness and cooperate with those attempting to give treatment." *O'Connor v. Donaldson*, 422 U.S. 563, 584 (1975) (Burger, C.J.,

46

concurring).  Because some individuals are "unable to recognize their illness or ask for assistance," they "cannot make their needs known" independently.  *Madrid v. Gomez*, 889 F. Supp. 1146, 1218, 1257 (N.D. Cal. 1995); *accord Coleman v. Wilson*, 912 F. Supp. 1282, 1305 (E.D. Cal. 1995) ("some inmates with serious mental disorders are, by virtue of their condition, incapable of making their needs for mental health care known").  Solitary confinement further hampers individuals' ability to report their symptoms, because mental-health interviews are not conducted in private.  A884 (Grassian report).  Thus, the risk that an individual with serious mental illness will decompensate when deprived of necessary treatment and placed in isolated confinement is made no less obvious simply because that patient does not report his decompensation.  The obviousness of that risk is particularly clear for medical professionals, whose "knowledge and training" would have included this basic fact.  *Lucas*, 58 F.4th at 1139.

The facts of this case confirm that commonsense principle.  Mr. Suarez has never been a "reliable reporter" of his symptoms.  A1381 (Kirby report); *supra* pp.6-8, 18 (documenting Mr. Suarez's history of inaccurate beliefs regarding his mental state).  And defendants knew that a failure to accurately self-report was a risk for Mr. Suarez specifically.  When Qayyum discontinued Mr. Suarez's medication, he did so knowing that patients like Mr. Suarez often incorrectly "believe they do not need medication" but decompensate without it.  A446.  Defendants similarly admit

that Kulick knew it was possible that a seriously mentally ill individual might not accurately self-report their symptoms if they were not taking necessary medication. A1978. Baker and Reynolds, for their part, documented that Mr. Suarez exhibited "poor" insight—in other words, that Mr. Suarez "doesn't have any insight into what his mental health is." A1023; A464; A456; A506. That evidence rebuts any inference that treating defendants would have put stock in Mr. Suarez failing to self-report hallucinations or other symptoms. At the very least, a factfinder should choose between that inference and the competing inferences supported by defendants' own statements.

In myopically focusing on Mr. Suarez's lack of self-reporting, the district court sought to contrast the facts here to those in *Barrett v. Livingston County*, which denied summary judgment on a deliberate-indifference claim when the plaintiff told a nurse he "felt 'very suicidal' and 'wanted to die'" and no action was taken in response. No. 14-CV-6593, 2019 WL 1083027, at *11 (W.D.N.Y. Mar. 7, 2019); *see* SPA28. That is faulty logic. Simply because reporting psychiatric symptoms precludes summary judgment does not mean such reporting is *necessary* to survive summary judgment—particularly when, as here, the record discloses that defendants otherwise knew of the risk of decompensation. What's more, the plaintiff in *Barrett* denied mental-health symptoms at other times, but that did not absolve defendants.

*Id.* at *9 (noting that plaintiff "did not request to see the jail's mental health therapist" and at other times "denied thoughts of lethality").

Accordingly, that Mr. Suarez did not inform defendants of certain symptoms of his decompensation does not erase the abundant evidence that defendants knew of that risk. *Supra* pp.32-45.

### ii. The district court further erred when discounting the evidence that Mr. Suarez's imminent or actual decompensation was obvious

The district court further erred in discounting the evidence of which defendants indisputably were aware. The court acknowledged that defendants knew "plaintiff's mental illness and history" and documented multiple "symptoms of his mental illness." SPA30. Yet it discounted that evidence, reasoning that it could not be considered "in isolation" from competing evidence that defendants documented more benign information about Mr. Suarez's mental state. SPA31-32. But it is hornbook law that a court may not "weigh" evidence on summary judgment, even when "not all of the evidence points in favor of" the plaintiff. *Proctor v. LeClaire*, 846 F.3d 597, 614 (2d Cir. 2017).

The non-binding cases on which the district court relied only reinforce its error. The court cited *Robinson v. Taylor*, in which a district court determined there was no evidence of deliberate indifference when an OMH psychiatrist observed a plaintiff to have "no suicidal ideations, behaviors or plans; no acute warning signs

or triggers; and no risk factors of suicide." No. 16-CV-285, 2019 WL 1429529, at *7 (N.D.N.Y. Mar. 29, 2019); *see* SPA30. Those plainly are not the facts here, where defendants observed multiple warning signs and had access to or reviewed medical records documenting specific risk factors, like medication noncompliance. *Supra* pp.32-45. And in any event, the defendant in *Robinson* still "prescribed" plaintiff "medication and directed that he remain in" a designated mental-health unit "for continued observation." 2019 WL 1429529, at *7. Similarly, in *Barnes v. Ross* (cited at SPA32), the defendants responded to an inmate's mental-health crises by "placing him on temporary observation and medication" following each incident. 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013). Treating defendants' ineffective actions are a far cry from the level of care described in those cases.[7]

The district court's treatment of other facts in the record further reveal its misunderstanding not just of the summary-judgment standard, but also of the deliberate-indifference standard:

*First*, the court concluded that treating defendants could not have been deliberately indifferent because Mr. Suarez's attack on his mother "is so outrageous

---

[7] The district court also passingly described Reynolds' and Baker's inadequate actions as mere failures in professional judgment. SPA31-32. But according to the decision the district court cited, "failings in professional judgment" occur when a healthcare provider "misse[s] warning signs of" harm. *King v. Annucci*, No. 20-CV-1413, 2023 WL 6122868, at *12 (N.D.N.Y. Sept. 19, 2023). As discussed, Reynolds and Baker either read, documented, or personally observed such warning signs.

that it belies common sense to argue any Treating Defendant should have foreseen it." SPA32. But that attack, while tragic, is legally irrelevant. To be deliberately indifferent, a defendant need only consciously disregard a significant risk of harm to the *plaintiff*, not a third party. Nor must the defendant predict the precise contours of how a harm may occur. *Farmer*, 511 U.S. at 843 (defendant may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault"). Here, all defendants needed to know was the risk of Mr. Suarez decompensating—not the risk that after decompensating he would harm a third party, much less a specific third party. The evidence shows they knew of that risk.

*Second*, the district court ignored the evidence that Mr. Suarez's decompensation was apparent to his family when they visited him on September 2. A793; A824 (Mr. Suarez's mother and sister observing him talking to himself). As noted above, this shows that Mr. Suarez's decompensation was so obvious that even non-medical professionals would have realized it as soon as they interacted with Mr. Suarez. But the district court reasoned that symptoms observed by third parties had no bearing on defendants' subjective state of mind. SA6. That was error: "Nothing … prohibits juries from … drawing an inference of actual knowledge from circumstantial evidence." *Sinkov v. Americor, Inc.*, 419 F. App'x 86, 89 (2d Cir.

2011) (citing *Farmer*, 511 U.S. at 842). That Mr. Suarez was displaying such visible symptoms during that visit is strong circumstantial evidence that he was displaying similar symptoms in front of defendants during the same period.

*Third*, in portions of its opinion, the district court appeared to suggest that the relevant question was whether defendants knew Mr. Suarez had *already* decompensated. *E.g.*, SPA26 ("the undisputed facts demonstrate it was not obvious to defendants that plaintiff was decompensating"). To the extent the court did so, it erred again. Deliberate indifference is satisfied as long as a defendant is aware of a "substantial *risk* of serious harm" (*Farmer*, 511 U.S. at 837) (emphasis added): the defendant need not know the harm has already occurred. So here, defendants need not have known that Mr. Suarez was already hearing voices; they need only have known of a significant risk that would occur.

Once these errors in the district court's analysis are properly disregarded, the record is replete with evidence from which a jury could find that treating defendants knew Mr. Suarez was decompensating—or at least at risk of decompensating—and failed to effectively address that risk.

### 2. *DOCCS defendants*

The district court's justifications for the conduct of the DOCCS defendants, Morton and Horan, fail for similar reasons. The court reasoned that Morton's and Horan's actions reflected a subjective intent to protect Mr. Suarez from further harm.

SPA26-30. In doing so, it appeared to rely on the principle that "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

But Morton's decision to secure Suarez's AOT order, and Horan's decision to sentence Suarez to keeplock, do not defeat deliberate indifference: they demonstrate it. Knowingly "ineffectual action" constitutes deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *accord Lucas*, 58 F.4th at 1142 ("patently unreasonable" response supports deliberate indifference); *Hathaway*, 37 F.3d at 68 (same for "largely ineffective" treatment plan). And a jury could readily find that Morton's and Horan's actions were ineffective. Even though Morton had authority to change Mr. Suarez's conditions of confinement (A356; A945), he allowed Mr. Suarez to remain in solitary confinement for two weeks and signed off his weeks-long period in keeplock, which has the same harmful qualities of solitary confinement. *Supra* p.44. Moreover, when petitioning for an AOT order, Morton admitted that he believed Mr. Suarez would continue to refuse medication absent court order, which would create a risk of violent behavior. *Supra* pp.14, 45. Yet despite Morton's authority to refer Mr. Suarez for OMH treatment (A335; A356), he did nothing to ensure Mr. Suarez would receive medication or any other therapy while at Downstate. A jury could infer that Morton knowingly delayed providing

53

Mr. Suarez treatment or alleviating the conditions of his confinement long enough for serious harm to occur. *Archer*, 733 F.2d at 16.

For Horan's part, sentencing Mr. Suarez to keeplock contravened DiNardo's advice to remove Mr. Suarez from disciplinary confinement, and posed substantially the same harms as SHU. *Supra* pp.43-44; *Porter*, 923 F.3d at 357. Indeed, there is no dispute that Horan knew that keeplock was a "confined setting" just like SHU. A2021. Nor does it matter that Horan believed OMH could and would initiate the removal of an inmate from SHU if medically necessary. *Contra* SPA29-30 (district court reasoning otherwise). "[A]ny DOCCS employee can refer an incarcerated individual to OMH if he/she believes that an incarcerated individual is in need of mental health treatment." A335. The district court cited no authority for the proposition that a defendant is permitted to ignore a known risk of harm that they have the authority and responsibility to address, simply because another party could also theoretically address that risk.

***

For all these reasons, the district court erred in granting summary judgment on Mr. Suarez's Eighth Amendment claims.

## CONCLUSION

The district court's judgment should be reversed and the case remanded for trial.

54

Dated:  July 23, 2024

Respectfully submitted,

s/ Alexandra M. Avvocato

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20036

JAMIE A. LEVITT
JOCELYN E. GREER
ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone:  (212) 887-6940
AAvvocato@mofo.com

ROBERT M. QUACKENBUSH
THE LEGAL AID SOCIETY
49 Thomas Street, 10th Floor
New York, NY 10013

*Counsel for Plaintiff-Appellant Elvin Suarez*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Rule 32.1(a)(4) because it contains 11,953 words, excluding those parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2022, in 14-point Times New Roman font.

Dated:  July 23, 2024                                    /s/ Alexandra M. Avvocato

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit via the ACMS system on July 23, 2024.  I have also submitted six paper copies to the Court via personal delivery the same day.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.


Dated:  July 23, 2024                          /s/ Alexandra M. Avvocato