# 24-872

## United States Court of Appeals for the Second Circuit

ELVIN SUAREZ,

*Plaintiff-Appellant,*

v.

ROBERT MORTON, Superintendent,
Downstate Correctional Facility, in his individual capacity,

*Defendants-Appellees.*

(*Caption continues inside front cover.*)

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ANAGHA SUNDARARAJAN
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-8073

Dated: October 22, 2024

*(Caption continues from front cover.)*

RYAN LAHEY, Office of Mental Health Unit Chief, Downstate Correctional Facility, in his individual capacity, ABADUL QAYYUM, Psychiatrist, Downstate Correctional Facility, in his individual capacity, PETER M. HORAN, Supervising Offender Rehabilitation Coordinator, Downstate Correctional Facility, in his individual capacity, MAURA L. DINARDO, Clinician, New York State Office of Mental Health, in her individual capacity, SAMANTHA L. KULICK, Psychology Assistant 3/Supervisor, New York State Office of Mental Health, in her individual capacity, BRANDON N. REYNOLDS, Psychiatrist, New York State Office of Mental Health, in his individual capacity, CHESNEY J. BAKER, Licensed Master Social Worker 2/Supervisor, New York State Office of Mental Health, in his individual capacity, ANTHONY J. ANNUCCI, Acting Commissioner, New York State Department of Corrections and Community Supervision, in his individual capacity,

*Defendants-Appellees*,

ANN MARIE SULLIVAN, Commissioner, New York State Office of Metal Health, in her individual capacity, NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION, NYS OFFICE OF MENTAL HEALTH,

*Defendants*.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUE PRESENTED ................................................................................ 3

STATEMENT OF THE CASE ................................................................. 3

    A.    Factual Background ...................................................................... 3

        1.    Suarez's treatment at Downstate ....................................... 3

        2.    The disciplinary proceedings ............................................. 9

        3.    The assisted outpatient treatment order and
                Suarez's release from custody ......................................... 14

    B.    The Present Action ..................................................................... 18

    C.    The District Court Grants Summary Judgment ..................... 20

STANDARD OF REVIEW ....................................................................... 23

SUMMARY OF ARGUMENT ................................................................. 23

ARGUMENT

    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT
    ON SUAREZ'S EIGHT AMENDMENT CLAIMS ........................................... 27

    A.    Defendants Did Not Consciously Disregard Suarez's
        Need for Mental Health Treatment ......................................... 29

        1.    Superintendent Morton and Horan did not deny
                Suarez mental health care. ............................................. 29

i

**Page**

2. Suarez's treatment providers did not subjectively believe he was at risk of decompensation. ..................... 31

3. Defendants were not deliberately indifferent to Suarez's need for medication. ........................................... 36

B. Defendants Were Not Deliberately Indifferent to the Risks Posed by Disciplinary Housing. .................................... 42

1. Suarez's disciplinary sanction does not support a deliberate indifference claim. ......................................... 43

2. Suarez's treatment providers did not believe he needed to be removed from disciplinary confinement. .................................................................... 47

CONCLUSION ...................................................................... 48

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Brock v. Wright,*
315 F.3d 158 (2d Cir. 2003) .......................................................... 30, 40

*Bryant v. Maffucci,*
923 F.2d 979 (2d Cir. 1991) ................................................................ 23

*Chance v. Armstrong,*
143 F.3d 698 (2d Cir. 1998) .......................................................... 28, 40

*Deebs v. Alstrom Transp., Inc.,*
346 F. App'x 654 (2d Cir. 2009) ......................................................... 23

*Estelle v. Gamble,*
429 U.S. 97 (1976).......................................................................... 29-30

*Farmer v. Brennan,*
511 U.S. 825 (1994)....................................................................27-28, 35

*Gonzalez v. Hasty,*
802 F.3d 212 (2d Cir. 2015) ............................................................... 43

*Greason v. Kemp,*
891 F.2d 829 (11th Cir. 1990)........................................................ 38-39

*Hathaway v. Coughlin,*
99 F.3d 550 (2d Cir. 1996) .......................................................... 29, 31

*Helling v. McKinney,*
509 U.S. 25 (1993).............................................................................. 27

*Hernandez v. Keane,*
341 F.3d 137 (2d Cir. 2003) ............................................................... 39

*Hill v. Curcione,*
657 F.3d 116 (2d Cir. 2011) ........................................................ 28, 37

*Idiakheua v. Morton,*
No. 20-cv-4169, 2024 WL 417058 (E.D.N.Y. Feb. 5, 2024) ............... 19

iii

| Cases | Page(s) |
|---|---|

*Jeffreys v. City of New York,*
    426 F.3d 549 (2d Cir. 2005) ........................................................ 23, 40

*Kelsey v. City of New York,*
    306 F. App'x 700 (2d Cir. 2009) .................................................. 28, 44

*Koon v. North Carolina,*
    50 F.4th 398 (4th Cir. 2022) .............................................................. 44

*Matter of K.L.,*
    1 N.Y.3d 362 (2004) ...................................................................... 15, 41

*Miller v. Schoenen,*
    75 F.3d 1305 (8th Cir. 1996) ............................................................. 39

*Palakovic v. Wetzel,*
    854 F.3d 290 (3d Cir. 2017) .............................................................. 45

*Parrish ex rel. Lee v. Cleveland,*
    372 F.3d 294 (4th Cir. 2004) ............................................................ 28

*Rivers v. Katz,*
    67 N.Y.2d 485 (1986) ................................................................... 36-37

*Steele v. Shah,*
    87 F.3d 1266 (11th Cir. 1996) .......................................................... 38

*Walker v. Schult,*
    717 F.3d 119 (2d Cir. 2013) ............................................................. 34

*Williams v. Secretary Penn. Dep't of Corr.,*
    --F.4th--, 2024 WL 4262139 (3d Cir. Sept. 20, 2024) .................. 43, 46

**Statute**

N.Y. Mental Hygiene Law § 9.60 ....................................................... 14, 41

iv

# PRELIMINARY STATEMENT

In this lawsuit under 42 U.S.C. § 1983, plaintiff-appellant Elvin Suarez sued five New York State Office of Mental Health (OMH) treatment providers who treated Suarez while he was incarcerated at Downstate Correctional Facility, and two New York State Department of Corrections and Community Supervision (DOCCS) officers. While at Downstate, the treatment providers evaluated Suarez, who suffers from schizoaffective disorder, on multiple occasions. During each evaluation, Suarez appeared stable and coherent, and he refused psychotropic medication to manage his mental illness. Suarez decompensated shortly after his release from Downstate and physically attacked his mother.

Suarez's complaint alleged that defendants failed to provide him with appropriate mental health treatment and improperly placed him in disciplinary confinement, in violation of the Eighth Amendment. The U.S. District Court for the Southern District of New York (Briccetti, J.) granted summary judgment to defendants.

This Court should affirm. The district court correctly held that no reasonable jury could conclude that any of the defendants acted with the culpable state of mind required to prove an Eighth Amendment claim.

First, the undisputed facts make clear that none of the defendants subjectively understood that Suarez was at significant risk of decompensating such that he required additional treatment. Suarez consistently told the providers that he felt fine, that he did not want medication, and that he was not hearing auditory hallucinations. And Suarez's treatment providers regularly assessed Suarez's condition, and he consistently presented as competent to make decisions about his own medical treatment. Though Suarez occasionally displayed symptoms of his mental illness, no reasonable juror could conclude that those symptoms were so obvious that his providers must have known that he was at significant risk of decompensating.

Second, the district court properly granted summary judgment to defendants on Suarez's Eighth Amendment claim regarding his short placement in disciplinary confinement. The two DOCCS officers who are defendants here—Downstate's Superintendent, Robert Morton, and the hearing officer responsible for Suarez's disciplinary hearing, Peter Horan—believed that Suarez's brief placement in disciplinary housing did not pose a significant risk to his mental health and that Suarez was receiving appropriate treatment for his mental illness. And no reasonable

juror could conclude that Suarez's treatment providers believed that Suarez needed to be removed from disciplinary housing.

## ISSUE PRESENTED

Whether the district court properly granted summary judgment on Suarez's Eighth Amendment claims where no reasonable jury could conclude that any of the defendants consciously disregarded a significant risk that Suarez would decompensate because Suarez consistently appeared stable and refused medication to treat his mental illness.

## STATEMENT OF THE CASE

### A.  Factual Background

### 1.  Suarez's treatment at Downstate

Plaintiff-appellant Elvin Suarez has a history of violent behavior that is driven, in part, by his drug abuse and schizoaffective disorder. Suarez's mental illness caused him to experience auditory hallucinations that urged him to commit acts of violence. (*See* Appendix (A.) 367-371, 481, 1452, 1455-1458.) Suarez had previously received inpatient psychiatric care at various hospitals, including at least once while in pretrial detention after being found incapacitated to stand trial. (A. 1458.) During

that time, Suarez was treated at Kirby Forensic Psychiatric Center, a secure inpatient psychiatric facility, and was prescribed psychotropic medication. (A. 1458.) Suarez regained capacity in March 2017, and was returned to pretrial detention at Rikers Island. (*See* A. 1458.) Suarez also had a history of medication noncompliance and, on at least one occasion, had to be medicated over his objection. (*See* A. 376.)

In June 2017, Suarez pleaded guilty to assaulting a police officer and was sentenced to two years of incarceration, with credit for time served in pretrial detention. (*See* A. 460, 1455.) He was placed in DOCCS custody at Downstate. At the time, mental health care at Downstate was provided by an OMH satellite unit staffed by full-time clinicians, social workers, and psychiatrists. (A. 690-691, 694-697.) OMH clinicians, not DOCCS correction officers, were responsible for providing incarcerated individuals with mental health care and had authority to divert those individuals placed in disciplinary confinement to an inpatient crisis treatment program if the individual showed signs of decompensation. (*See* A. 333-335, 406, 690-691, 693.) OMH clinicians could not compel DOCCS to house incarcerated individuals in a particular unit or to alter an their disciplinary sanction. (A. 406.)

4

On June 23, 2017, the day after Suarez arrived at Downstate, defendant Samantha Kulick,[1] an OMH clinician, evaluated Suarez to determine whether he should be added to OMH's caseload. (A. 420.) During this evaluation, Kulick observed that Suarez appeared stable: his mood, affect, and thought process all appeared normal and he demonstrated fair insight and judgment regarding his condition. (A. 491-492.) She also noted that Suarez had a prescription for psychotropic medication from Kirby. (A. 477.) Because of Suarez's schizoaffective disorder diagnosis, Kulick recommended that Suarez be assigned to OMH's caseload at the highest level of care.[2] (A. 420, 477.) Kulick was subsequently assigned to serve as Suarez's primary clinician. (A. 420.)

Kulick met with Suarez again four days later to develop his treatment plan. (A. 420, 494.) Suarez again had a normal affect, demon-

---

[1] Kulick has since changed her last name to Guth. (A. 419.) Because she was consistently referred to as "Kulick" in the district court, this brief will do the same for purpose of clarity.

[2] Individuals in OMH care are given a numerical designation that corresponds to the level of care that individual requires. (A. 691.) Kulick recommended that Suarez be designated at Level 1, meaning he required the highest level of care. (A. 477.) This designation was based on the nature of his diagnosis, rather than the severity of his symptoms when he entered DOCCS custody. (*See* A. 477.)

5

strated fair insight and judgment, and displayed logical thinking. (A. 492.) He also denied experiencing hallucinations, obsessions, phobias, or any other kinds of disturbances that would suggest that he was at risk of decompensating. (A. 492.) During this meeting, Kulick explained to Suarez that he would have regular monthly therapy appointments, as well as routine follow-ups with an OMH psychiatrist as scheduled. (A. 494.) Kulick further explained that Suarez would be screened for signs of psychiatric decompensation during these appointments but could access mental health services between appointments if he required immediate intervention. (A. 420-421, 494.)

Consistent with his treatment plan, Suarez was evaluated by defendant Dr. Abdul Qayyum, an OMH psychiatrist, on June 30. (A. 445.) During that appointment, Dr. Qayyum observed that Suarez appeared coherent, logical, and future-oriented. (A. 445.) Suarez's mood and affect appeared "good," his cognitive function appeared "adequate," and his insight and judgment appeared "intact." (A. 445.) During that meeting, Suarez explained that he had only experienced auditory hallucinations once and that he no longer experienced hallucinations. (A. 445.) Suarez also said that he did not want to continue taking medication because it

did not help his symptoms. (A. 445, 562.) Dr. Qayyum recommended that Suarez continue medication and explained to Suarez the risks and benefits of the medication that he had previously been prescribed as well as other alternative treatments. (A. 445-446, 562.) Suarez nevertheless confirmed that he wanted to discontinue medication. In light of that refusal, Dr. Qayyum agreed to discontinue Suarez's prescription for psychotropic medication for the time being, with the understanding that Suarez would continue to receive other forms of mental health treatment and be monitored by OMH clinicians.[3] (A. 445-447, 562.) Because Suarez appeared stable and coherent, Dr. Qayyum did not believe that Suarez lacked capacity to make this decision.

Suarez's next appointment was on July 19 with Kulick. During this appointment, Kulick again observed that Suarez's speech, thought

_____

[3] Suarez testified that he did not remember discussing the benefits of medication with any of his treatment providers but agreed that he asked to stop taking medication because he believed that he did not need it. (A. 380-381.) Other than this June 30, 2017 appointment and an August appointment with a doctor to discuss outpatient treatment (A. 385), Suarez did not recall meeting with any mental health providers while at Downstate (A. 380-381). However, his medical records include contemporaneous treatment notes from each formal appointment with an OMH clinician or psychiatrist.

7

processes, mood, and affect appeared normal and that he did not exhibit any symptoms of distress. Kulick also noted that Suarez had made good progress on his treatment goals and seemed able to manage symptoms of his mental illness effectively through coping behaviors developed in therapy. Suarez again reported that he did not need medication and that he felt fine. And Kulick again explained to Suarez how to access mental health services outside the framework of his regularly scheduled appointments if he began to experience symptoms of his mental illness. (A. 497-498.) There is no evidence that Suarez ever tried to access these additional services.

Suarez met with Dr. Qayyum two days later. Like Kulick, Dr. Qayyum observed that Suarez was coherent and stable. Dr. Qayyum noticed that Suarez was not animated, but explained that this was not unusual for individuals in a carceral setting. (A. 447.) Consequently, Dr. Qayyum did not believe Suarez's lethargy was a symptom of decompensation. During this appointment, Dr. Qayyum again discussed with Suarez the risks and benefits of medication, including the consequences of remaining off medication for a prolonged period, and Suarez again refused medication. (A. 447, 564.) Dr. Qayyum believed that Suarez

understood the discussion regarding medication and was competent to make his own decision regarding medication. (A. 447.)

Around this time, OMH also began to put together a discharge plan for Suarez to help match Suarez with community health services upon his release from DOCCS custody. Because Suarez received credit on his sentence for time served in pretrial detention, he was scheduled to be released in early September. (*See* A. 460.) To facilitate the discharge planning process, Suarez met with Defendant Chesney Baker, a licensed social worker, on August 3, 2017, to discuss his treatment history and mental health needs. During that meeting, Baker, like Suarez's other treatment providers, observed that Suarez appeared logical, oriented, and stable, and Suarez again explained that he did not need medication to manage his symptoms. (A. 460-461.)

## 2. The disciplinary proceedings

On August 8, 2017, Suarez became loud and disruptive while being escorted from breakfast back to his housing unit. He refused to obey direct orders from a correction officer and threatened that officer and others. He then kicked the correction officer, striking him in the knee. (A. 930.) After the incident, Suarez was referred to OMH for evaluation by a

9

DOCCS officer. (A. 424.) Based on that referral, Kulick met with Suarez and noted that Suarez appeared calm and coherent, though he did not want to discuss the incident and would not make consistent eye contact with her. (A. 424, 502-503.) Because Kulick did not believe that Suarez was decompensating, she did not believe that he needed to be, or was eligible to be, transferred to Downstate's inpatient crisis treatment unit. (A. 424.)

Suarez was transferred to segregated confinement in Downstate's Special Housing Unit (SHU), where individuals with a disciplinary ticket for a severe disciplinary violation are generally housed during the pendency of their disciplinary proceedings. (*See* A. 332.) Suarez was then evaluated by defendant Maura DiNardo, the OMH clinician responsible for incarcerated individuals in SHU. DiNardo explained that Suarez declined a full interview but agreed to participate in an evaluation, and appeared stable, cooperative, and alert. (A. 413, 468-469.) Suarez denied hearing auditory hallucinations and showed no signs of decompensation, so DiNardo had no basis to remove him from SHU to an inpatient treatment unit. (A. 413-414.) After Suarez entered SHU, DiNardo took

over from Kulick as his primary clinician, and Kulick did not treat Suarez again. (A. 412, 415.)

DiNardo conducted daily rounds to interact with incarcerated individuals held in SHU, though she did not usually document her conversations in an individual's treatment notes unless the individual showed signs of decompensation or requested additional mental health services. DiNardo engaged with Suarez during her rounds and observed that he appeared stable, calm, and "even-keeled." (A. 414.) DiNardo explained that this stability was not unusual: while placement in SHU can cause some individuals to decompensate, it does not affect all individuals with mental illness in the same way and some individuals with mental illness may even do better in segregated confinement compared to the general population. (A. 416.)

For the first seven days that Suarez was in SHU, he was subject to a deprivation order, meaning he could not leave his cell or see visitors. This order was authorized by the correction officer responsible for SHU, who is not named as a defendant here. (*See* A. 1061.) After seven days, any extension of the deprivation order had to be authorized by defendant Robert Morton, the Superintendent of Downstate. Morton declined to

renew the deprivation order when it was presented to him for authorization, and the order was lifted on August 15, 2017. (A. 1060-1061.)

Suarez's disciplinary hearing began on August 15 and was conducted by defendant Peter Horan, a DOCCS officer.[4] (A. 341.) During the hearing, Horan noticed that Suarez appeared "off." (A. 1089, 1093-1094.) Though Horan was aware of Suarez's mental illness, he explained that, as a layperson, he did not know how to assess Suarez's condition and relied on OMH clinicians to evaluate and treat Suarez. (A. 1093-1094.)

Horan adjourned the hearing to receive confidential testimony from OMH regarding Suarez's mental illness. (*See* A. 341, 355, 470.) DiNardo provided that testimony and explained that, although Suarez was able to understand the proceedings against him, his mental illness should be considered a mitigating factor when assessing the penalty. DiNardo also testified that Suarez had no prior history of disciplinary confinement and, because of that, likely was not suited for confinement in SHU.

---

[4] Although Horan had initially sought and obtained a one-day extension to start the hearing, the hearing started as scheduled on August 15. (A. 354.)

DiNardo also confirmed that, regardless of the penalty, OMH would continue to monitor Suarez and provide treatment, including diversion to Downstate's inpatient crisis unit if such diversion was appropriate. (A. 1166.)

DiNardo evaluated Suarez again on August 22, fourteen days after he entered SHU. (A. 414.) DiNardo observed that Suarez appeared stable and remained oriented on his anticipated release from DOCCS custody and his reunion with his mother. Suarez also did not show any signs of psychiatric decompensation and denied hearing voices or experiencing delusions. (A. 414-415, 471-472.)

That same day, Suarez pleaded guilty to the disciplinary violation and was sentenced to fourteen days' time served in SHU, thirty days in keeplock in the general population, and thirty additional days in keeplock that were suspended and would not be served if Suarez did not incur any additional disciplinary violations. Suarez did not lose any privileges or good time credit. (A. 341-345.) Horan explained that he considered the punishment lenient and believed that it balanced Suarez's mental illness against the need to deter future misconduct. (A. 344-345, 1092-1093.)

Superintendent Morton confirmed the penalty on August 23, 2017. (A. 919.)

### 3. The assisted outpatient treatment order and Suarez's release from custody

While Suarez's disciplinary proceedings were ongoing, OMH was also working to compile Suarez's release plan. As explained above (at 9), this process began on August 3, 2017, when Suarez met with Baker to discuss his treatment needs. (*See* A. 460-461.)

Suarez met with Baker again on August 16, while Suarez was in SHU. During this meeting, Baker explained that OMH would evaluate Suarez to determine if he qualified for assisted outpatient treatment (AOT), a state-law process designed to help individuals with mental illness receive a range of outpatient services, consistent with a court-ordered treatment plan.[5] Suarez reiterated to Baker during that meeting

---

[5] Where, as here, the person for whom AOT is sought is incarcerated, the superintendent of the facility where the individual resides may file a petition in the state court, supported by an evaluation and treatment plan from a qualified physician. Mental Hygiene Law § 9.60(e)(iv). The court may order the treatment plan if it finds by clear and convincing evidence that the individual meets the statutory criteria for AOT and that the proposed treatment plan is the "least restrictive treatment appropriate and feasible." *Id*. § 9.60(j). The court need not find

(continued on the next page)

that he felt fine and that he did not need medication. Suarez also confirmed that he knew how to access mental health services and would do so if necessary. (A. 463-464.)

The following day, Suarez met with defendant Dr. Brandon Reynolds, an OMH psychiatrist, who evaluated Suarez to determine if he met the statutory criteria for AOT. (*See* A. 454, 504.) Dr. Reynolds observed that Suarez's affect was mildly elevated and that he laughed and smiled inappropriately during their meeting. Suarez otherwise appeared alert and oriented. Consequently, Dr. Reynolds did not believe that Suarez was unstable or experiencing a mood episode. (A. 504-505.) During that meeting, Dr. Reynolds discussed medication with Suarez, who had been refusing medication. (*See* A. 456.) DiNardo did not observe Suarez laughing or smiling inappropriately when she evaluated Suarez a few days later, on August 22, 2017. (*See* A. 414-415, 471-472.)

Following his release from SHU, Suarez met Dr. Qayyum for a regularly scheduled appointment on August 24, and again refused medication. (A. 565-566.) During this appointment, Dr. Qayyum noticed that

---

that the individual is incapacitated or is decompensating to order AOT. *See Matter of K.L.*, 1 N.Y.3d 362, 371-72 (2004).

Suarez laughed inappropriately, but that he otherwise seemed stable. (A. 447-448, 565-566.) Like Dr. Reynolds, Dr. Qayyum explained that he did not believe that Suarez was unstable or likely to decompensate imminently. (A. 447-448.)

The following day, Dr. Reynolds conducted an AOT evaluation and prepared a proposed treatment plan, which was filed in Supreme Court, Dutchess County, along with a petition signed by Superintendent Morton. (A. 512-525.) During this evaluation, Dr. Reynolds noted that Suarez's affect was mildly elevated and that he demonstrated poor insight by insisting that he did not have a mental illness. Suarez otherwise appeared stable. (A. 506-507.) Dr. Reynolds' proposed treatment plan included outpatient treatment at a clinic in Staten Island that specialized in providing care for individuals with mental illness and a history of substance abuse. The treatment plan contemplated that Suarez would receive psychotropic medication but left it to his treatment provider at the clinic to prescribe medication as necessary. (A. 524, 528.)

Suarez was released from DOCCS custody on September 5, 2017 (*see* A. 466), with an AOT order in place (A. 508-509).[6] On the day of his release, Suarez met with Baker to go over his discharge plan, which included an initial intake appointment at the Staten Island clinic on September 7. (A. 466.) Baker again observed that Suarez appeared normal during this meeting. (A. 466-467.) In total, Suarez spent seventy-five days at Downstate. During this time, Suarez was seen for formal appointments on thirteen different days by five mental health providers. Suarez never told any of those providers, or any person at Downstate, that he was experiencing auditory hallucinations. (A. 383.) Nor did he ever seek out mental health treatment beyond his regularly scheduled appointments.

Suarez testified that, when he was released, he felt normal and was not hearing voices. (A. 387.) But, the day after his release, Suarez began experiencing hallucinations and, as a result, attacked and repeatedly

---

[6] Suarez's mother and sister visited Suarez at Downstate shortly before his release. During this visit, Suarez was unable to carry on a conversation and had to leave the visit to vomit. (A. 793.) Suarez's mother testified that she told two unnamed correction officers that her son needed help, but there is no evidence that any of the named defendants were aware of this visit or of Suarez's symptoms during the visit. (A. 794.)

17

stabbed his mother with a kitchen knife. (A. 388.) He is currently housed at Kirby after being found not guilty of attempted murder by reason of mental illness.

## B.    The Present Action

Suarez filed the present lawsuit in the U.S. District Court for the Southern District of New York against OMH, DOCCS, and ten named defendants: then-DOCCS Commissioner Anthony Annucci, OMH Commissioner Ann Marie Sullivan, OMH's Downstate Unit Chief Ryan Lahey, Downstate Superintendent Robert Morton, DOCCS Officer Peter Horan, OMH clinicians Samantha Kulick and Maura DiNardo, OMH psychiatrists Dr. Abdul Qayyum and Dr. Brandon Reynolds, and OMH social worker Chesney Baker. Suarez's first amended complaint advanced various claims under the Eighth Amendment, the Americans with Disabilities Act (ADA), the Rehabilitation Act, and the New York Correction Law, all of which centered on his allegation that he did not receive adequate treatment for his mental illness while at Downstate and that

he should not have been placed in disciplinary confinement because of his mental illness.[7] (*See* A. 80-131.)

At the motion to dismiss stage, the district court dismissed Suarez's claims under the ADA and the Rehabilitation Act. (A. 154-157.) The court also dismissed Suarez's claims against the two state agencies (*see* A. 162), and against Commissioner Sullivan and DiNardo for lack of personal involvement. (A. 148, 152-153.) However, the court allowed Suarez to amend his complaint to include allegations regarding DiNardo's personal involvement.[8] (*See* A. 165-167, 180-181.)

---

[7] Suarez's mother, Maritza Idiakeheua, the victim of his assault, filed a separate action in the U.S. District Court for the Eastern District of New York against Superintendent Morton, OMH Downstate Chief Lahey, Horan, and Baker, as well as Suarez's case manager and parole officer, alleging, among other things, that these defendants violated her Fourteenth Amendment rights by failing to treat Suarez's mental illness, thereby creating a danger to her. *See Idiakheua v. Morton*, No. 20-cv-4169, 2024 WL 417058 (E.D.N.Y. Feb. 5, 2024) (reproduced at A. 2042-2068). The district court in that case (Garaufis, J.) denied summary judgment based on the specific facts in that record, and that case has since settled.

[8] Though Suarez's second amended complaint also repleaded claims against the two agencies and Commissioner Sullivan and under the ADA and Rehabilitation Acts, he did not offer any additional allegations regarding those claims or contest their dismissal either before the district court or now on appeal. (*See* A. 221, 228, 265-270.)

**C.   The District Court Grants Summary Judgment**

The district court (Briccetti, J.) granted summary judgment to all remaining defendants on all remaining claims. As relevant here, the court explained that Suarez's Eighth Amendment claims must be evaluated under the deliberate indifference standard. (Special Appendix (S.A.) 24-25.) That standard, the court explained, required Suarez to prove that he suffered a sufficiently serious harm and that the defendants acted with a sufficiently culpable state of mind. (S.A. 25.) The court held that summary judgment was appropriate because "no defendant subjectively believed plaintiff faced a substantial risk of serious harm."[9] (S.A. 26.)

The court explained that although Superintendent Morton and Horan were aware of Suarez's mental illness, neither knew that Suarez was at substantial risk of decompensating. Both defendants believed OMH staff would address any risk posed to Suarez from his placement in SHU. The court further explained that both defendants did consider and

---

[9] Defendants did not move for summary judgment on, and the district court did not consider, the question whether defendants' actions, viewed objectively, placed Suarez at significant risk of serious harm. (S.A. 25 n.13.) The district court also did not reach the question whether defendants are entitled to qualified immunity, though defendants advanced this argument below. (A. 36 n.20.)

respond to Suarez's mental illness but did not believe Suarez was at risk of decompensating. For example, Superintendent Morton declined to renew the deprivation order at the earliest possible juncture and sought an AOT order to ensure that Suarez continued to receive mental health treatment upon his release. And Horan imposed a disciplinary sanction that ensured Suarez would be removed from SHU as soon as possible after his disciplinary hearing concluded. (S.A. 27-29.)

With respect to Suarez's treatment providers—defendants Kulick, Dr. Qayyum, DiNardo, Dr. Reynolds, and Baker—the court held that none of these defendants were aware that Suarez was decompensating or was at significant risk of doing so. (S.A. 30.) The court explained that each defendant treated Suarez multiple times. And each time, Suarez "presented to and communicated with [them] in a manner that did not give them reason to believe he was psychologically decompensating," even if he sometimes showed symptoms of mental illness. (S.A. 30.) The court further explained that none of these defendants knew that Suarez was experiencing auditory hallucinations, "the distinct symptom of plaintiff's decompensation." (S.A. 30.)

21

The court also emphasized that Dr. Reynolds and Baker took "affirmative steps to protect plaintiff from any harm" by seeking an AOT order for him and ensuring that he could be seen at the Staten Island clinic promptly after his release from custody. (S.A. 31; *see* A. 408.) Consequently, the court held, "the undisputed facts portray an attentive team of mental health care professionals who made a judgment call . . . that their mentally ill patient was lucid and functioning." (S.A. 33.)

The district court also granted summary judgment to Commissioner Annucci and OMH Unit Chief Lahey, finding no evidence that either was personally involved in Suarez's care. (S.A. 26-28.) And the court granted summary judgment to defendants on Suarez's claim under the New York Correction Law. (S.A. 34-36.) On appeal, Suarez does not challenge the grant of summary judgment to Commissioner Annucci or OMH Unit Chief Lahey, or on the Correction Law claim. Br. for Appellant (Br.) at 4 n.1.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See, e.g.*, *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991). In doing so, the Court considers whether the record, taken as a whole, could lead a rational trier of fact to find in favor of the nonmoving party. *Id.* But, this Court need not credit the nonmovant's own testimony where that testimony is contradicted by documentary evidence. *Deebs v. Alstrom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (quotation marks omitted); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005).

## SUMMARY OF ARGUMENT

As the district court correctly concluded, no reasonable fact finder could conclude that any of the defendants were aware of, but nevertheless ignored, a significant risk that Suarez would decompensate without additional treatment or removal from disciplinary housing. Consequently, even drawing all reasonable inferences in Suarez's favor, no reasonable juror would conclude that any of the defendants acted with the level of culpable recklessness required to find liability under the Eighth Amendment.

23

**A.** There is no basis in the record to conclude that any of the defendants intentionally delayed or denied Suarez medical care or ignored a significant risk that his condition would deteriorate without additional treatment.

1. With respect to Superintendent Morton and Horan, it is undisputed that both defendants believed that OMH clinicians would monitor Suarez's condition and provide treatment as appropriate. Neither defendant prevented Suarez from receiving treatment or had any reason to believe that the treatment Suarez received was inadequate.

2. None of Suarez's treatment providers—Kulick, Dr. Qayyum, DiNardo, Baker, and Dr. Reynolds—subjectively believed that Suarez was at significant risk of imminently or rapidly decompensating. Each treatment provider met with Suarez multiple times and observed that he was stable. Most of these interactions were documented through contemporaneous notes showing that Suarez's treatment providers believed that he was coherent, logical, and competent to make decisions regarding his treatment. Though Suarez occasionally showed symptoms of his mental illness, these instances do not support the inference that Suarez was

24

obviously decompensating or that his treatment providers deliberately ignored clear signs that he was in distress.

3. The record also does not support Suarez's contention that his treatment providers were deliberately indifferent to Suarez's need for psychotropic medication to prevent decompensation. Even if each treatment provider was aware that Suarez may, in theory, decompensate without medication, each provider observed that Suarez consistently refused medication. Suarez's treatment providers, and in particular Dr. Qayyum, believed that Suarez understood the risks and benefits of medication and was competent to decline medication. Indeed, Dr. Qayyum discontinued Suarez's prescription only after Suarez insisted that he did not want or need medication to control his symptoms, a sentiment Suarez repeated to each of his treatment providers on multiple occasions.

Contrary to Suarez's assertion, Dr. Reynolds and Superintendent Morton seeking the AOT order does not support a contrary conclusion with respect to those defendants' state of mind. The AOT order was designed to ensure that Suarez would have access to a range of mental health services after his release from DOCCS custody and deferred to Suarez's outpatient treatment provider regarding medication.

25

**B.** The district court also correctly rejected Suarez's contention that his placement in disciplinary confinement constituted deliberate indifference.

1. Nothing in the record supports the inference that Superintendent Morton and Horan subjectively believed that Suarez's placement in disciplinary confinement was likely to cause him harm. Both defendants believed that OMH clinicians were monitoring Suarez's condition and would remove him from disciplinary housing if appropriate. And both defendants took affirmative steps to respond to Suarez's mental illness—Horan by sentencing Suarez leniently to ensure that he was removed from SHU as quickly as possible, and Superintendent Morton by lifting Suarez's deprivation order and petitioning for Suarez to receive AOT. That Suarez has a mental illness does not alone support the conclusion that either Horan or Superintendent Morton was deliberately indifferent to a significant risk to Suarez's mental health from his placement in SHU.

2. Suarez's treatment providers could not alter Suarez's disciplinary penalty. And based on his presentation, the treatment providers did not believe that Suarez required immediate transfer out of SHU to a crisis

26

treatment unit. No reasonable juror could conclude that the providers' declining to transfer Suarez constituted deliberate indifference.

## ARGUMENT

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT ON SUAREZ'S EIGHT AMENDMENT CLAIMS

The only claims at issue in this appeal arise under the Eighth Amendment, which prohibits the "unnecessary and wanton infliction of pain" on incarcerated individuals. *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

These claims are evaluated under the two-part deliberate indifference framework. First, that framework requires proof that the plaintiff was subject to a serious deprivation of "the minimal civilized measure of life's necessities" or to a "substantial risk of serious harm"—commonly referred to as the objective prong. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quotation marks omitted). Second, the plaintiff must prove that each defendant acted with a "sufficiently culpable state of mind"—commonly referred to as the subjective prong. *See id.* (quotation marks omitted). Only the subjective prong is at issue in this appeal.

To have the requisite culpable state of mind, a defendant must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm" to the plaintiff existed, and the defendant must have also subjectively drawn that inference. *Id*. at 837. A defendant's failure to alleviate harm that should have been—but was not—perceived cannot support a finding of deliberate indifference. *See id*. at 837-38; *see also Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). Deliberate indifference is also not established where a defendant exercised judgment in response to the information available to the defendant at the time, even if, in hindsight, that judgment was incorrect or even negligent. *See, e.g.*, *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011); *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 309 (4th Cir. 2004); *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009).

Applying these standards, the district court correctly determined that defendants are each entitled to summary judgment here. The undisputed facts established that Suarez's treatment providers each subjectively believed that Suarez was stable and was not at significant risk of decompensating. A reasonable juror would not conclude that

28

Suarez's symptoms of decompensation were so obvious that his treatment providers must have known that he was at significant risk of harm.

## A. Defendants Did Not Consciously Disregard Suarez's Need for Mental Health Treatment.

The district court correctly granted summary judgment on Suarez's claim that the defendants were deliberately indifferent to Suarez's mental-health treatment needs. No reasonable fact finder could conclude that each defendant intentionally delayed or denied Suarez's access to necessary medical care, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976), or acted in a manner that "evinces a conscious disregard of a substantial risk of serious harm." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quotation marks omitted).

### 1. Superintendent Morton and Horan did not deny Suarez mental health care.

The district court properly granted summary judgment to Horan and Superintendent Morton on Suarez's medical-treatment Eighth Amendment claim. It is undisputed that Horan and Superintendent Morton are not mental health professionals and were thus not involved in the provision of mental health care to Suarez (or any incarcerated

individual at Downstate). OMH clinicians, not DOCCS officers, are solely responsible for providing mental health treatment for incarcerated individuals at Downstate. (*See* A. 333, 406, 690-691.)

Moreover, there is no evidence here that Superintendent Morton or Horan prevented Suarez from accessing mental health care or intentionally interfered with his prescribed course of treatment. *See Estelle*, 429 U.S. at 104-05. To the contrary, both Superintendent Morton and Horan believed that OMH clinicians were monitoring and treating Suarez, and that OMH could and would provide additional treatment if necessary. (*See* A. 338, 1093-1094 (Horan); 363 (Morton).) Plaintiff did not provide any evidence to dispute their subjective belief. Consequently, no reasonable fact finder could conclude that Horan and Superintendent Morton were deliberately indifferent to Suarez's need for additional medical care. *See Brock v. Wright*, 315 F.3d 158, 162, 164 (2d Cir. 2003) (prison superintendent was at most negligent in deferring to physician's recommended course of treatment).

## 2. Suarez's treatment providers did not subjectively believe he was at risk of decompensation.

The undisputed facts also make clear that Suarez's treatment providers—Kulick, Dr. Qayyum, DiNardo, Baker, and Dr. Reynolds—each subjectively believed, based on their consistent interactions with Suarez over several appointments, that Suarez was stable and was not at risk of imminently decompensating. Each defendant, therefore, did not believe that Suarez required additional medical care and did not deliberately disregard Suarez's need for treatment. *See, e.g.*, *Hathaway*, 99 F.3d at 553. The district court properly granted summary judgment to these defendants.

For example, the undisputed facts established that Kulick met with Suarez four times between June 22 and August 8, 2017. See *supra* at 5-8, 10. During each appointment, Kulick noted that Suarez appeared logical, coherent, and stable. (A. 473-477 (June 23); 486-487, 491-495 (June 27); 481-485, 488-490 (July 19); 502-503 (August 8).) During these meetings, Suarez denied experiencing symptoms of decompensation, and Kulick had no reason to disbelieve Suarez's description of his symptoms. (*See* A. 420-424.)

31

Kulick's observations were corroborated by Dr. Qayyum's and Baker's observations during the same time frame. Dr. Qayyum met with Suarez twice before Suarez's disciplinary infraction and, like Kulick, observed that Suarez appeared coherent, logical, and future-oriented, and that his insight and judgment appeared intact. (A. 561-562 (June 30); 563-654 (July 21).) Baker similarly observed on August 3 that Suarez appeared logical, oriented, and stable. (A. 460-461.) Like Kulick, neither Dr. Qayyum nor Baker had reason to disbelieve Suarez's assertion that he was not experiencing symptoms of his mental illness and did not need or want additional treatment.

Suarez continued to present as stable and coherent after he was taken to SHU following the disciplinary infraction on August 8. When Suarez arrived in SHU, DiNardo took over for Kulick as Suarez's primary clinician: Kulick did not treat Suarez after August 8, and Suarez offers no basis from which a reasonable juror could conclude that Kulick subjectively believed that Suarez was not receiving adequate treatment from other OMH clinicians after this date.

While Suarez was in SHU, DiNardo met with him twice for formal evaluations and interacted with him daily during her rounds. DiNardo

consistently observed that Suarez appeared stable, logical, and even-keeled, and showed no symptoms of decompensation. (A. 412-416, 468-472.) As before, Suarez denied experiencing hallucinations or any other symptoms of his mental illness and DiNardo had no basis to question these statements. (A. 414-415.)

Dr. Reynolds, Dr. Qayyum, and Baker also all met with Suarez between the disciplinary infraction on August 8, and his release from DOCCS custody on September 5. Each defendant observed that, during this time, Suarez's affect was mildly elevated and that he occasionally laughed or smiled inappropriately. (A. 408-409 (Baker); 456, 504-507 (Dr. Reynolds); 447-448 (Dr. Qayyum).) But, as both Dr. Qayyum and Dr. Reynolds explained, Suarez otherwise appeared stable and coherent, so neither doctor believed that Suarez was experiencing a mood episode or was at risk of immanently decompensating. (A. 447-448, 456.) This conclusion was supported by Baker's independent observations during her meetings with Suarez on August 16 and September 5. On both occasions, Baker noted that Suarez appeared logical and coherent, and did not show symptoms of decompensation. (A. 408-410, 463-467.) And, as

Suarez himself acknowledges, Suarez never told any of his treatment providers that he was experiencing auditory hallucinations. (A. 383.)

Consequently, none of Suarez's treatment providers subjectively believed that Suarez was in distress or at risk of imminent decompensation and, thus, required additional intervention or more frequent monitoring.

Contrary to Suarez's contention (*see* Br. at 46-50), the record does not support a reasonable inference that Suarez's symptoms were so obvious that his treatment providers must have known but nevertheless chose to disregard the fact that Suarez was decompensating. *See, e.g.*, *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

Though Suarez exhibited some symptoms of his mental illness, he also consistently presented as logical and stable. Both Kulick and DiNardo evaluated Suarez immediately after his disciplinary infraction on August 8, and observed that he appeared calm, coherent, and alert, and Suarez denied experiencing auditory hallucinations. (A. 424, 502-503 (Kulick); 413-414, 468-469 (DiNardo).) Though DiNardo testified that Suarez's disciplinary infraction may be attributed, in part, to his mental illness (A. 1165-1166), she explained that his disciplinary infraction could also

34

be attributed to stress, and that she did not believe that Suarez was decompensating at the time of the infraction (A. 416). Neither Kulick nor DiNardo (or indeed, any of Suarez's other treatment providers) believed that Suarez committed a disciplinary violation because he was decompensating, and Suarez points to nothing in the record that would allow a fact finder to draw the contrary inference.

Similarly, though both Dr. Reynolds and Dr. Qayyum observed that Suarez was laughing and smiling inappropriately, both also explained that Suarez was otherwise logical and coherent and that they therefore did not believe he was at risk of decompensating or experiencing a mood episode. (A. 447-448, 455-456.) Moreover, none of Suarez's treatment providers were aware of his mother's observations during her visit to Downstate shortly before his release. (*See* A. 793-794.)

Even if, as Suarez contends, his treatment providers should have interpreted his symptoms differently, the record does not support the inference that these defendant in fact did so. Consequently, Suarez's elevated affect during these interactions would not leave a reasonable fact finder to conclude that his treatment providers acted with a sufficiently culpable state of mind. *See Farmer*, 511 U.S. at 832, 837.

35

### 3. Defendants were not deliberately indifferent to Suarez's need for medication.

Contrary to Suarez's contention (*see* Br. at 34-42) a reasonable fact finder could not conclude that his treatment providers knew that Suarez required medication to control his symptoms but nevertheless denied him medication or medication education.

Although Suarez had been prescribed psychotropic medication to control his mental-illness symptoms prior to arriving at Downstate (*see* A. 1452, 1455-1458), it is undisputed that Suarez consistently refused medication after arriving at Downstate. Indeed, on at least seven occasions, Suarez informed his treatment providers that he did not want to take medication. (*See, e.g.*, A. 445 (to Dr. Qayyum on June 30); 497-498 (to Kulick on July 17); 447 (to Dr. Qayyum on July 21); 460-461 (to Baker on August 3); 463-464 (to Baker on August 16); 456 (to Dr. Reynolds on August 17); 447-448 (to Dr. Qayyum on August 24).)

Suarez's refusal to take medication is highly relevant because, under New York law, Suarez has a "fundamental common-law right" to "control the course of [his] medical treatment" and decline medication if he chooses. *See Rivers v. Katz*, 67 N.Y.2d 485, 493 (1986). Suarez could not be medicated over his objection without a judicial finding that, among other

36

things, he is incompetent to make decisions about his own treatment and that the proposed treatment is in his best interests. *See id*. at 494-95, 497.

Here, no reasonable juror could conclude that Suarez's treatment providers knew that he was incompetent to decline medication or was an immediate danger to himself or others absent medication. As explained above (at 31-35), the record makes clear that Suarez's treatment providers did not believe that he was decompensating, or that he was unable to accurately describe his present symptoms or make decisions about his own treatment. (*See* A. 445-447.) Suarez asserts that his treatment providers should have known that he was incompetent to decline medication because he had previously been found incompetent while at Kirby. (*See* A. 1444-1446.) But Suarez subsequently regained capacity while at Kirby, and his treatment providers at Downstate undisputably observed that he appeared capable of making a decision regarding his own treatment. A finding of deliberate indifference must be based on the information that each defendant had at the time, *see Hill*, 657 F.3d at 123, and the treating defendants subjectively relied on their own observations here.

37

Suarez errs in arguing (Br. at 35) that Dr. Qayyum's June 30 decision to not fill Suarez's prescription for psychotropic medication raises a triable issue of deliberate indifference. As Suarez himself acknowledged, Dr. Qayyum discontinued Suarez's prescription after a twenty- to thirty-minute evaluation, during which Suarez told Dr. Qayyum that he no longer experienced auditory hallucinations, that psychotropic medication did not help him manage his symptoms, and that he did not want to continue taking medication. (A. 380-381, 445-446.) Dr. Qayyum also understood both that Suarez would continue to receive regular mental health care to help manage his symptoms and that Suarez could be medicated in the future if he agreed to take medication or if his condition worsened to the point where treatment providers believed that Suarez was incompetent to refuse medication or presented a danger.[10]

------

[10] The cases on which Suarez relies (Br. at 27-28, 34) are distinguishable for this reason. For example, in *Steele v. Shah*, the Eleventh Circuit allowed a plaintiff's deliberate indifference claim to proceed based on record evidence that the defendant, the plaintiff's treating physician, met with plaintiff for less than a minute before determining that plaintiff did not require medication and cancelling his prescription for psychotropic medication. 87 F.3d 1266, 1267 (11th Cir. 1996). The Eleventh Circuit reached a similar conclusion in *Greason v. Kemp* based on evidence showing that the treating physician cancelled plaintiff's prescription after a

(*continued on the next page*)

38

(A. 445-446.) Even if, in hindsight, Dr. Qayyum should not have accepted Suarez's representations at face value, the decision to do so was at most negligent and did not rise to the level of deliberate indifference. *Cf. Hernandez v. Keane*, 341 F.3d 137, 147 (2d Cir. 2003) (no deliberate indifference where medical staff delayed hand surgery because, inter alia, prisoner refused to take medication).

Suarez misplaces his reliance (Br. at 27) on the Eighth Circuit's decision in *Miller v. Schoenen*, 75 F.3d 1305 (8th Cir. 1996). In that case, the plaintiff's treating physician recommended significant follow-up care after the plaintiff underwent surgery. Rather than provide that care or perform any other reasonable alternative treatments, the *Miller* defendants simply ignored plaintiff's condition. *Id.* at 1310. In contrast, there is no dispute here that Suarez continued to receive treatment for his mental illness after he refused medication and that he made progress toward his treatment goals. (*See* A. 497.) In light of Suarez's persistent refusal to take medication, his treatment providers' decision to focus

---

cursory evaluation and with no follow-on care. 891 F.2d 829, 832 (11th Cir. 1990). Here, by contrast, Dr. Qayyum conducted an evaluation and Suarez continued to receive mental-health treatment.

instead on therapy and other interventions does not reasonably suggest deliberate indifference.

Suarez's testimony that he did not discuss the benefits of medication with his treatment providers (*see* Br. at 32-35) does not give rise to a disputed question of fact because it is directly contradicted by the documentary record. *See Jeffreys*, 426 F.3d at 554-55. Contemporaneous records from Dr. Qayyum's appointments with Suarez indicate that Dr. Qayyum provided medication education (A. 561-566), and Dr. Qayyum explained that he discussed the risks and benefits of medication with Suarez during these appointments (A. 445-447). Suarez's belief that his treatment providers could have done more to encourage him to take medication does not support a deliberate indifference claim. *See, e.g.*, *Brock*, 315 F.3d at 165 (prisoner's belief that more should have been done does not suggest deliberate indifference); *Chance*, 143 F.3d at 703 (same with respect to an prisoner's preference for a different treatment). In any event, a dispute about medication education would ultimately be immaterial because Suarez points to nothing in the record to support the inference that he would have agreed to take psychotropic medication if he had received medication education. If anything, Suarez's testimony

that he did not understand his mental illness and so, did not believe he needed medication while at Downstate, supports the contrary inference. (*See* A. 369-373, 384-385.)

Suarez misunderstands the purpose of AOT in arguing (*see* Br. at 41-42) that Dr. Reynold's decision to seek AOT for Suarez suggests that Dr. Reynold's knew that Suarez could not make his own decisions about medication. Under New York Mental Hygiene Law § 9.60, an AOT order is to ensure that individuals like Suarez receive mental health treatment in the community in circumstances where that individual is unlikely to seek out treatment on his own. See *supra* at 14-15. The statute defines assisted outpatient treatment broadly to include several "categories of outpatient services," including case management, care coordination, therapy and counseling, and substance abuse, and there is no requirement that an individual be at significant risk of decompensating before being subject to an AOT order. *See* MHL § 9.60(a)(1), (c); *Matter of K.L.*, 1 N.Y.3d 362, 371-72 (2004) (AOT does not require a finding of incapacity).

While Suarez was in DOCCS custody, OMH clinicians monitored his condition and provided mental health treatment. Dr. Reynolds sought

the AOT because Suarez needed the same kind of monitoring after his release from Downstate, and the AOT order would ensure that he had resources in place to provide that kind of supervision and care. (*See* A. 520-522.) That Dr. Reynolds believed Suarez would benefit from AOT does not support the conclusion that Suarez received inadequate care while at Downstate. Nor does it support the conclusion that Suarez was at imminent risk of decompensating without medication (*contra* Br. at 41). Rather, the purpose of AOT was to ensure that Suarez had a treatment team in place to evaluate his condition and prescribe medication if necessary after his release from custody.

## B. Defendants Were Not Deliberately Indifferent to the Risks Posed by Disciplinary Housing.

The district court also correctly granted summary judgment to defendants on Suarez's claim that his placement in disciplinary confinement—first in SHU for fourteen days and then in keeplock in the general population for another fourteen days—constituted deliberate indifference.

The Eighth Amendment generally prohibits officers from subjecting individuals with a "known history of severe mental illness" to "prolonged,

indefinite solitary confinement without penological justification," *Williams v. Secretary Penn. Dep't of Corr.*, --F.4th--, 2024 WL 4262139, at *9 (3d Cir. Sept. 20, 2024). But, the Eighth Amendment does not prohibit solitary confinement in all cases, even for individuals with mental illness. *See Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015) (Eighth Amendment claim predicated on SHU confinement "typically accrues only after an inmate has been confined in the SHU for a prolonged period of time"). No reasonable juror could conclude that Suarez's short placement in disciplinary confinement violated the Eighth Amendment.

### 1.  Suarez's disciplinary sanction does not support a deliberate indifference claim.

The record in this case does not support a reasonable inference that either Superintendent Morton or Horan subjectively believed that Suarez's placement in disciplinary confinement was likely to cause Suarez harm. As explained above, Suarez was placed in SHU while his disciplinary proceedings were ongoing. (*See* A. 332, 1083.) During this time, both Superintendent Morton and Horan believed that OMH clinicians were monitoring Suarez's condition and would remove him from SHU if he

showed symptoms of decompensation. (*See* A. 338, 1093-1094 (Horan); 363 (Morton).)

Indeed, as the district court noted, both defendants took affirmative steps to mitigate any risk from Suarez's placement in disciplinary housing, undermining any inference that these defendants were deliberately indifferent to Suarez's mental illness. *See Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022) (good faith efforts to remedy the problem will generally preclude a deliberate indifference finding); *see also Kelsey*, 306 F. App'x at 703 ("We agree with the other Circuits which have, in general, found deliberate indifference lacking where officers take affirmative and reasonable steps" to prevent harm.).

Horan, the hearing officer responsible for Suarez's disciplinary hearing, considered confidential testimony regarding Suarez's mental illness and imposed what he considered a lenient penalty. (*See* A. 341-347, 1092-1093.) As Horan explained, the penalty he imposed accounted for the severity of Suarez's disciplinary infraction and the need to deter future assaults on DOCCS staff while also ensuring that Suarez could be removed from SHU as quickly as possible. (A. 337-338, 1092.) At no point did Horan believe that Suarez was at risk of decompensating or that his

44

brief placement in SHU and then in keeplock would harm Suarez's mental health. (A. 338.) In these circumstances, no reasonably fact finder could conclude that Horan was deliberately indifferent to a known risk to Suarez's mental health.

Similarly, the record does not support the inference that Superintendent Morton knew that Suarez was at risk of decompensating or that the disciplinary penalty imposed was likely to harm his mental health. That Superintendent Morton subsequently petitioned a court for Suarez to receive AOT does not support the contrary conclusion. *See* Br. at 45. As explained above (at 29-30, 41-42), Superintendent Morton had no reason to believe that the care Suarez was receiving while at Downstate was inadequate. Rather, the AOT order was intended to ensure that Suarez continued to receive supervision and care once he was no longer under OMH's supervision.

Suarez's reliance on *Palakovic v. Wetzel*, 854 F.3d 290 (3d Cir. 2017), and other out-of-circuit cases (Br. at 30-31) is misplaced. The Eighth Amendment does not impose a blanket prohibition on solitary confinement; nor does it prohibit any individual with mental illness from being housed in SHU for any period of time for any reason. Rather, as the

45

Third Circuit has explained, the Eighth Amendment prohibits an individual with severe mental illness from being held in SHU for a "prolonged, indefinite" period of time "without penological justification." *Williams*, 2024 WL 4262139, at *15.

No reasonable juror could conclude that Suarez's placement in disciplinary confinement rose to that level. Suarez was in SHU for fourteen days, while his disciplinary proceeding was ongoing. Suarez's subsequent placement in keeplock in the general population was also not prolonged or indefinite. Instead, it is undisputed that Suarez was placed in keeplock for thirty days because of his disciplinary violation and that he served only fourteen of those days before being released from Downstate. In these circumstances, the mere fact that Suarez has a mental illness is not enough to support the inference that Horan or Superintendent Morton knew that he faced a substantial risk of decompensation while in segregated confinement and were deliberately indifferent to that risk.

## 2. Suarez's treatment providers did not believe he needed to be removed from disciplinary confinement.

It is undisputed that Suarez's treatment providers—Kulick, Dr. Qayyum, DiNardo, Dr. Reynolds, and Baker—did not have authority to impose or modify his disciplinary penalty. (*See, e.g.*, A. 406, 426, 431.) Suarez instead predicates his conditions of confinement claim on his contention that these defendants should have transferred him from disciplinary confinement to an inpatient mental health unit. This argument fails.

Suarez's treatment providers believed that he could be removed to an inpatient unit only if he showed symptoms of decompensation or posed a risk of suicide. (A. 414, 424.) But as explained above (at 31-35), none of Suarez's treatment providers believed that Suarez was at serious risk of decompensating or harming himself. Consequently, none of Suarez's treatment providers believed that Suarez required diversion to an inpatient crisis unit.

## CONCLUSION

For the foregoing reasons, the District Court's decision should be affirmed.

Dated: New York, New York
October 22, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By:   */s/ Anagha Sundararajan*
    ANAGHA SUNDARARAJAN
    Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ANAGHA SUNDARARAJAN
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-8073

48

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Oren L. Zeve, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 8,835 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.


*/s/ Oren L. Zeve*