# 24-872

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ELVIN SUAREZ,

*Plaintiff-Appellant,*

v.

ROBERT MORTON, Superintendent, Downstate Correctional Facility, in his individual capacity, RYAN LAHEY, Office of Mental Health Unit Chief, Downstate Correctional Facility, ABDUL QAYYUM, Psychiatrist, Downstate Correctional Facility, PETER M. HORAN, Supervising Offender Rehabilitation Coordinator, Downstate Correctional Facility, MAURA L. DINARDO, Clinician, NYS Office of Mental Health, SAMANTHA L. KULICK, Psychology Assistant 3/Supervisor, NYS Office of Mental Health, BRANDON N. REYNOLDS, Psychiatrist, NYS Office of Mental Health, CHESNEY J. BAKER, Licensed Master Social Worker 2/Supervisor, NYS Office of Mental Health, ANTHONY J. ANNUCCI, Acting Commissioner, NYS Department of Corrections and Community Supervision.,

*Defendant-Appellee.*

Appeal from the United States District Court for the Southern District of New York, Case No. 7:20-cv-7133, Hon. Vincent L. Briccetti

### REPLY BRIEF FOR PLAINTIFF-APPELLANT ELVIN SUAREZ

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20036

ROBERT M. QUACKENBUSH
THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT
49 Thomas Street, 10th Floor
New York, NY 10013

JAMIE A. LEVITT
JOCELYN E. GREER
ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4149
AAvvocato@mofo.com

*Counsel for Plaintiff-Appellant Elvin Suarez*

November 26, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................... ii

INTRODUCTION ....................................................................1

ARGUMENT ..........................................................................2

A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANTS WERE DELIBERATELY INDIFFERENT TO A SIGNIFICANT RISK TO MR. SUAREZ'S MENTAL HEALTH..........................2

    A.    Defendants Repeat The District Court's Error Of Treating Mr. Suarez's Failure To Report His Symptoms As Dispositive .................3

        1.    Each treating defendant knew they could not rely on Mr. Suarez's account of his symptoms and mental state.................5

        2.    Defendants' attempts to erase these factual disputes fail .........11

    B.    Defendants' Reliance On Mr. Suarez's Purported "Refusal" To Take Medication Is A Misdirection ...................................................16

    C.    The DOCCS Defendants Cannot Avoid Liability.............................19

    D.    Each Defendant Had Authority And Responsibility To Remove Mr. Suarez From Harmful Conditions Of Confinement ....................22

CONCLUSION .....................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bellamy v. City of New York*,
914 F.3d 727 (2d Cir. 2019) ...............................................................16

*Brock v. Wright*,
315 F.3d 158 (2d Cir. 2003) ...............................................................20

*Clark v. Coupe*,
55 F.4th 167 (3d Cir. 2022) ...............................................................11

*Darnell v. Pineiro*,
849 F.3d 17 (2d Cir. 2017) ...............................................................22

*Deebs v. Alstom Transp., Inc.*,
346 F. App'x 654 (2d Cir. 2009) ...............................................15, 16

*Farmer v. Brennan*,
511 U.S. 825 (1994) ...............................................................2

*Frost v. New York City Police Dep't*,
980 F.3d 231 (2d Cir. 2020) ...............................................................15

*Gonzalez v. Hasty*,
802 F.3d 212 (2d Cir. 2015) ...............................................................23

*Greason v. Kemp*,
891 F.2d 829 (11th Cir. 1990) ...............................................................11

*Hathaway v. Coughlin*,
37 F.3d 63 (2d Cir. 1994) ...............................................................12

*Hernandez v. Keane*,
341 F.3d 137 (2d Cir. 2003) ...............................................................18

*Hill v. Curcione*,
657 F.3d 116 (2d Cir. 2011) ...............................................................10

*Idiakheua v. Morton*,
    No. 20-CV-4169 (NGG) (SJB), 2024 WL 417058 (E.D.N.Y. Feb.
    5, 2024) ..................................................................................20, 21, 22

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005) ........................................................15, 16

*Johnson v. Wright*,
    412 F.3d 398 (2d Cir. 2005) ........................................................10, 11

*In re K.L.*,
    806 N.E.2d 480 (N.Y. 2004) ..........................................................4, 13

*Kelsey v. City of New York*,
    306 F. App'x 700 (2d Cir. 2009) ........................................................19

*Koon v. North Carolina*,
    50 F.4th 398 (4th Cir. 2022) ..............................................................20

*Parrish ex rel. Lee v. Cleveland*,
    372 F.3d 294, 309 (4th Cir. 2004) ......................................................10

*Lucas v. Turn Key Health Clinics, LLC*,
    58 F.4th 1127 (10th Cir. 2023) ............................................................3

*Miller v. Schoenen*,
    75 F.3d 1305 (8th Cir. 1996) ..............................................................11

*Rivers v. Katz*,
    495 N.E.2d 337 (N.Y. 1986) ..............................................................17

*Steele v. Shah*,
    87 F.3d 1266 (11th Cir. 1996) ............................................................11

*Williams v. Sec'y Pa. Dep't of Corr.*,
    117 F.4th 503 (3d Cir. 2024) ..............................................................23

*Williams v. Vincent*,
    508 F.2d 541 (2d Cir. 1974) ..............................................................12

## INTRODUCTION

For over a month, Elvin Suarez—who has schizoaffective disorder and a documented history of decompensating without medication—was under defendants' care and control at Downstate Correctional Facility. During that time, his prescribed antipsychotic was discontinued, he was deprived of any other minimally adequate mental-health treatment, and he was held in solitary and keeplock confinement for weeks. It is undisputed that he decompensated as a result, to tragic consequences. The sole question on appeal is if there is a triable issue that "defendants were aware of, but nevertheless ignored, a significant risk that Suarez would decompensate" under these circumstances. Response Br. 23.

As Mr. Suarez explained, a jury could reasonably find that each defendant must have known of that obvious risk. That conclusion is supported by a host of circumstantial evidence, including defendants' own observations and admissions. In arguing otherwise, defendants overlook key facts and ignore the errors in the district court's reasoning. In fact, defendants repeat those errors, treating Mr. Suarez's failure to report his decompensation or seek treatment as dispositive—even though defendants understood at the time that Mr. Suarez lacked the insight necessary to take those actions. And defendants advance reasoning that goes beyond the district court's opinion, wrongly arguing that Mr. Suarez's "refusal" to medication absolved

1

defendants of any responsibility to treat Mr. Suarez. The judgment should be reversed and the case remanded for trial.

## ARGUMENT

### A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER DEFENDANTS WERE DELIBERATELY INDIFFERENT TO A SIGNIFICANT RISK TO MR. SUAREZ'S MENTAL HEALTH

As Mr. Suarez explained, there is ample evidence that both the treating defendants and the DOCCS defendants exhibited deliberate indifference to his mental health needs. That is because they knew of a serious risk that Mr. Suarez would decompensate without antipsychotic medication or other adequate care, particularly while being held in solitary confinement (SHU) and keeplock for weeks on end—yet did nothing to mitigate that risk. *See* Opening Br. 26-46. The district court erred by effectively imposing a direct-evidence requirement under which Mr. Suarez's failure to report his own decompensation was dispositive to defendants' knowledge. *See* Opening Br. 46-54. Compounding that error, the district court wrongly discounted circumstantial evidence of defendants' knowledge by deeming it less probative than other evidence that, in its view, favored defendants. *See* Opening Br. 49-54.

In defending the district court's decision, defendants fail to explain why the court did not err by demanding direct evidence of knowledge over circumstantial, including evidence that the risk here was obvious. *See Farmer v. Brennan*, 511 U.S.

2

825, 842 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence" such as evidence that "the risk was obvious."). And they fail to justify the district court's refusal to consider defendants' particular "knowledge and training" when assessing the evidence of their knowledge. *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1139 (10th Cir. 2023) (explaining that such facts are "highly relevant and may tend to show awareness of and disregard of a substantial risk"). Yet once those errors are rectified, the record supports each defendant's deliberate indifference—and defendants cannot avoid that result by overlooking some facts and misconstruing others.

## A. Defendants Repeat The District Court's Error Of Treating Mr. Suarez's Failure To Report His Symptoms As Dispositive

Defendants assert that the treating defendants could not have known of a risk of Mr. Suarez's decompensation, much less that he was actively decompensating, absent being informed of that decompensation by Mr. Suarez directly. According to defendants, they had no "reason to disbelieve Suarez's assertion that he was not experiencing symptoms of his mental illness and did not need or want additional treatment." Response Br. 32 (describing Dr. Qayyum and Baker); *see* Response Br. 21 (asserting that Kulick "had no reason to disbelieve Suarez's description of his symptoms"). That blind acceptance extended to Mr. Suarez's statements about his need for medication: defendants assert that they "believed that Suarez understood

3

the risks and benefits of medication and was competent to decline medication" (Response Br. 25); and did not know Mr. Suarez "was an immediate danger to himself or others absent medication" (Response Br. 37).

But the treating defendants were mental-health professionals who were trained to understand the obvious: the key feature of Mr. Suarez's mental illness is that he could not reliably report his own symptoms or understand his need for medication and other treatment. That conclusion is supported through the testimony of Mr. Suarez's expert (A884); Mr. Suarez's treatment records, to which the treating defendants had access (A1381 (noting that Mr. Suarez "did not appear to be a reliable reporter" of his hallucinations)); and the reasoning of various courts in the deliberate-indifference context. *See* Opening Br. 46-47. In other words, that Mr. Suarez never reported hallucinations or requested mental-health services (Response Br. 8, 17) is a symptom of his mental illness—not a sign of its absence on which treating defendants could rely. Defendants have no response to this reality, even though the very authorities they cite corroborate it. *In re K.L.*, 806 N.E.2d 480, 482 (N.Y. 2004) (explaining that New York's legislature deemed assisted-outpatient-treatment orders necessary because "[s]ome mentally ill persons, because of their illness, have great difficulty taking responsibility for their own care, and often reject the outpatient treatment offered to them on a voluntary basis"). And, contrary to

defendants' assertions, each treating defendant subjectively understood that this commonsense risk was present here.

### 1. Each treating defendant knew they could not rely on Mr. Suarez's account of his symptoms and mental state

In his opening brief (at 26-43), Mr. Suarez thoroughly set out the evidence of each treating defendant's deliberate indifference:

**1.** Dr. Qayyum, Mr. Suarez's psychiatrist at Downstate, knew that "some people" in Mr. Suarez's situation "believe they do not need medication, but once they stop taking it they begin to decompensate." A445-46; A1448. Yet he affirmatively placed Mr. Suarez at risk of that decompensation by discontinuing his antipsychotic based solely on Mr. Suarez's mistaken assertion that he was "fine," and then failing to provide required medication education. A380; A561-62. Nor did Dr. Qayyum flag his discontinuation of medication to Kulick or anyone else—creating a risk of harm so obvious that his supervisor admitted it. A985 (Lahey testifying that had he learned "a psychiatrist had taken someone off their meds and that the primary clinician wasn't told for three weeks," he would have felt the "need[] to address" that situation).

As Mr. Suarez spent weeks without medication and in disciplinary confinement, Dr. Qayyum documented inappropriate smiling and laughter, indicia of hallucinations. A447; *see* A1378 (medical records noting that Mr. Suarez "display[ed] inappropriate smiling and laughter" at Downstate, "as might be seen in

an individual experiencing hallucinations"). But he made no effort to remove Mr. Suarez from confinement, despite his authority to do so, or offer any other treatment. Dr. Qayyum took all these actions (or inactions) despite having access to treatment records confirming that Mr. Suarez had a history of non-compliance with medication and "will decompensate if non-compliant." A445-46; A967-68; A1448. *See* Opening Br. 32-36. In light of Dr. Qayyum's knowledge and training, plus the facts he learned about Mr. Suarez's history and health, he knew of an obvious risk that Mr. Suarez would be unable to understand, address, or report his likely decompensation.

    **2.** Kulick, Mr. Suarez's primary clinician, understood it was possible that a person with serious mental illness might not accurately self-report their symptoms if they were not taking necessary medication. A1986. Thus, she knew that merely waiting for Mr. Suarez to request treatment would be insufficient to protect him against his mental illness. She also noted the importance of Mr. Suarez maintaining his medication, documenting that he "endorses compliance with his medication and believes" it is "effective in treating his psychiatric symptoms." A491; A494. But Kulick took no action after learning Mr. Suarez's medication had been abruptly discontinued—and not providing required medication education—despite knowing of the risk that situation created. A481-85; A816-17; A1524. And Kulick chose not to investigate the incident triggering Mr. Suarez's confinement in SHU, even though

DOCCS's urgent mental-health referral following that incident stated that Mr. Suarez was placed in a spit mask and did not know the current date. A652; A972; A1994; *contra* Response Br. 32 (asserting that "Suarez continued to present as stable and coherent after he was taken to SHU following the disciplinary infraction"). All the while, Kulick had access to the same records warning of Mr. Suarez's decompensation under these circumstances. Those facts belie any inference that Kulick had no reason to mistrust Mr. Suarez's silence about any symptoms. *See* Opening Br. 36-38.

**3.** DiNardo, Mr. Suarez's primary clinician while he was in SHU, never checked in on Mr. Suarez during that period. A383 (Mr. Suarez testifying that while he was in SHU and experiencing hallucinations, he never spoke to a mental-health provider). Even were the Court to reject Mr. Suarez's testimony in favor of DiNardo's competing testimony—which is impermissible at this stage— DiNardo's account of cursory rounds during which she merely said "hi" to Mr. Suarez from outside his cell cannot be reasonably described as mental-health treatment. A414; A1004; *see* A988 (DiNardo's supervisor agreeing that such conduct does not qualify as "treatment").

Yet, as defendants effectively admit, DiNardo was subjectively aware of a significant risk Mr. Suarez was decompensating while he went without any treatment. She knew that "placement in SHU can cause a person to decompensate."

7

A416. And she recognized that his "disciplinary infraction" that placed Mr. Suarez in SHU "may be attributed, in part, to his mental illness." Response Br. 34. That she believed there was a possibility the incident was instead caused by stress does not negate her knowledge that a *risk* existed. *Contra* Response Br. 34-35 (suggesting DiNardo must have known to a certainty that the incident was caused by Mr. Suarez's illness). And even after Mr. Suarez was sentenced to keeplock—contravening DiNardo's own recommendation that he be removed from such disciplinary housing on account of his mental illness—she did not follow up with him once. The combination of DiNardo's ineffective treatment and admitted knowledge make it obvious that she knew of the relevant risk, even if she never examined Mr. Suarez for long enough to confirm it. *See* Opening Br. 39-40.

**4.** Dr. Reynolds and Baker, both of whom evaluated Mr. Suarez multiple times, documented that he suffered from "poor" insight—that is, he lacked "any insight into what his mental health is." A456; A464; A1023; *see also* A504 (Dr. Reynolds noting that Mr. Suarez "does not believe he has any mental illness"). And Dr. Reynolds noted that Mr. Suarez was exhibiting symptoms of hallucinations like inappropriate smiling and laughter. A456; A504; A1374; A1446. Those observations refute the notion that Dr. Reynolds and Baker had no reason to question Mr. Suarez's account of his symptoms and mental state. What's more, Dr. Reynolds recognized that Mr. Suarez's disciplinary incident likely occurred because he had

been off his medication for five weeks (A520-21)—contrary to defendants' insistence that no defendant "believed that Suarez committed a disciplinary violation because he was decompensating." Response Br. 35.

Finally, Dr. Reynolds attested, in support of an assisted-outpatient-treatment (AOT) order, that Mr. Suarez's "non-compliance with psychiatric treatment and medication" had previously "resulted in a recurrence of psychiatric instability with suicidal thoughts and threats, relapse on illegal drugs, hospitalizations and incarceration," and that this pattern would continue without "court ordered outpatient treatment." A521. And he prepared a treatment plan that called for daily antipsychotic medication. A1253-58; A1273. Baker similarly understood that part of what qualified Mr. Suarez for an AOT order was his "history of noncompliance and psychiatric decompensation … and subsequent violence." A1048-49. They nevertheless stood by as Mr. Suarez went weeks without that concededly necessary medication or meaningful treatment and in isolated confinement. *See* Opening Br. 40-43.

All this evidence supports the inference that each treating defendant knew Mr. Suarez would very likely decompensate—or was already decompensating—under the conditions in which he was placed, *and* that he would not be able to alert others to that decompensation. That makes this case unlike those in which there is "no evidence" that defendants "subjectively recognized that their precautions would

9

prove to be inadequate." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 309 (4th Cir. 2004) (cited at Response Br. 28). And treating defendants knew this decompensation would likely occur precisely because they were deviating from Mr. Suarez's recommended treatment. *Cf. Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (cited at Response Br. 28, 37) (dismissing Eighth Amendment claim when there was "no indication in the complaint that any medical provider recommended treatment different from the treatment that Hill was afforded").

As Mr. Suarez explained, this Court and others have found evidence of deliberate indifference under analogous circumstances. Opening Br. 32-34 (collecting cases). In *Johnson v. Wright*, this Court held that a triable issue of deliberate indifference existed when defendants, including a DOCCS physician, denied a plaintiff medication that his treating physicians had deemed "medically appropriate"—even though there was evidence that defendants' alternative treatment was medically justifiable and complied with prison guidelines. 412 F.3d 398, 404-06 (2d Cir. 2005). Defendants' decision to allow Mr. Suarez to remain in SHU and keeplock for weeks compounded that deliberate indifference: when "officials kn[o]w the risks" that solitary confinement "pose[s] to [a plaintiff] as a mentally ill inmate but d[o] not respond reasonably to ensure his safety," it constitutes an "unexplained inaction in the face of a known risk [that] has long been

held violative of the Eighth Amendment." *Clark v. Coupe*, 55 F.4th 167, 184 (3d Cir. 2022); *see* Opening Br. 30-31 (collecting cases).

### 2. *Defendants' attempts to erase these factual disputes fail*

**1.** Defendants attempt to distinguish some—but not all—of the Eighth Amendment authorities cited in Mr. Suarez's opening brief; they have no response to this Court's decision in *Johnson*. The distinctions they identify are either irrelevant or non-existent. For instance, they contend that *Steele v. Shah*, 87 F.3d 1266 (11th Cir. 1996) and *Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990) are inapplicable because the defendants in those cases met with the plaintiffs for "less than a minute" or for a "cursory evaluation" before discontinuing their psychotropic medication. Response Br. 38 n.10. But there is no bright-line rule that an inference of deliberate indifference is defeated after a certain amount of time: a doctor can ignore medical advice in one minute or twenty; and the length or number of medical appointments has no bearing on whether adequate medical treatment results. Plus, as amply discussed above and in the opening brief, the evidence shows that the treating defendants' evaluations of Mr. Suarez *were* cursory, if not non-existent.

Similarly, defendants argue this case is unlike *Miller v. Schoenen*, 75 F.3d 1305 (8th Cir. 1996)—in which a triable issue of deliberate indifference existed when a prison doctor denied necessary "specialized care" that was documented in a patient's treatment notes, *id.* at 1310—because Mr. Suarez "continued to receive

treatment for his mental illness." Response Br. 39. But they fail to explain what that treatment was, besides a scattered series of ineffective evaluations. In any event, this is not a case where defendants were merely negligent or provided a different treatment plan than what a plaintiff would have preferred. *Contra* Response Br. 39-40. Even when a plaintiff is receiving some form of treatment, "deliberate indifference can be established through evidence the defendant "knew the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the plaintiff's] situation." *Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994); *accord Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974). The evidence shows that defendants knew—whether from Mr. Suarez's records, the AOT materials, or their own observations and experience—that Mr. Suarez's treatment at Downstate would be, and was, largely ineffective at preventing his decompensation.

**2.** Defendants also contend that Mr. Suarez "misunderstands the purpose of AOT" when relying on it to show defendants' knowledge, because an AOT order does not require "that an individual be at significant risk of decompensating." Response Br. 41. The very decision defendants cite states otherwise:

> an AOT order requires findings that the patient … has a history of lack of compliance with treatment that has either necessitated hospitalization or resulted in acts of serious violent behavior or threats of, or attempts at, serious physical harm; the patient is unlikely to voluntarily participate in the recommended treatment plan; **the patient is in need of assisted outpatient treatment in order to prevent a relapse or deterioration which**

12

> **would be likely to result in serious harm to the patient or others**; and it is likely that the patient will benefit from assisted outpatient treatment.

*In re K.L.*, 806 N.E.2d at 486 (emphasis added).

Regardless, the evidence of knowledge here is not merely the fact of the AOT order, but the statements supporting the AOT order, which expressly describe the risk of decompensation. *See* Opening Br. 14-15. Thus, all the defendants who were involved in or familiar with the successful AOT application—Dr. Qayyum, Dr. Reynolds, Baker, and Morton—knew Mr. Suarez had a history of non-compliance with medication; had previously decompensated without that medication and was at serious risk of doing so again here; and that these risks could not be adequately addressed absent measures like an AOT order. Yet Mr. Suarez was not receiving those concededly necessary treatment measures at Downstate, or an adequate substitute. Thus, the AOT application and order confirms defendants' deliberate indifference. *Contra* Response Br. 41 (suggesting that Mr. Suarez was receiving the same care at Downstate that was set forth in the AOT order).

**3.** Finally, defendants urge the Court to improperly weigh the disputed facts in their favor.

Like the district court, defendants deem irrelevant the fact that Mr. Suarez's mother observed his decompensation, pointing out that no defendant learned of her observations. A793; A824; *see* Response Br. 35. They fail to realize that this

13

evidence is significant because it suggests that even a layperson encountering Mr. Suarez, as all defendants did, would necessarily have realized he had decompensated. Defendants also make much of the fact that the treating defendants observed that Mr. Suarez presented as stable by some metrics. *E.g.*, Response Br. 31-34. But it is for the factfinder to decide whether those indicators, which might cut against defendants' lack of knowledge of a risk, outweigh the other indicators that defendants *were* aware of a risk. Similarly, defendants attempt to downplay the importance of Mr. Suarez's previous medical records warning of his history of non-compliance and risk of decompensation. According to defendants, those records state that while Mr. Suarez had "previously been found incompetent" and subject to an order for medication over objection, he "subsequently regained capacity." Response Br. 37; *see* A1444-46. But the question is not whether defendants must have known whether Mr. Suarez was incompetent for purposes of a medication-over-objection order—Mr. Suarez does not contend defendants should have obtained such an order (which is distinct from an AOT order). The question is whether defendants must have known Mr. Suarez would suffer hallucinations, violent behavior, and otherwise decompensate without medication. His available records expressly stated this would happen. A1448.

Defendants finally argue that treating defendants did provide the required medication education. Response Br. 40. But that again implicates a factual dispute.

A383 (Mr. Suarez's competing testimony); A888 (expert recounting Mr. Suarez's statement that "no one at Downstate educated him regarding the critical importance of remaining on his medication in order to maintain his psychiatric stability"). In response, defendants contend Mr. Suarez's testimony "does not give rise to a disputed question of fact because it is directly contradicted by the documentary record." Response Br. 40 (citation omitted). The decisions on which they rely do not support that result. In *Jeffreys v. City of New York*—an employment discrimination case—the Court held that no triable dispute existed when the plaintiff "relie[d] almost exclusively on his testimony, much of which [was] contradictory and incomplete" such that no reasonable jury could credit it. 426 F.3d 549, 554 (2d Cir. 2005). In the other, unpublished opinion defendants cite, the Court applied *Jeffreys* to another employment discrimination suit where plaintiffs similarly relied "almost exclusively" on the "speculative" and "conclusory" testimony about others' discriminatory intent. *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009). As this Court has repeatedly instructed, *Jeffreys*' rule is "narrow" and should not be extended to the "ordinary case where a district court is asked to consider the contradictory deposition testimony [or declaration] of a fact witness." *Frost v. New York City Police Dep't*, 980 F.3d 231, 246 (2d Cir. 2020) (alteration in original).

This case is nothing like *Jeffreys*. Mr. Suarez's statement that no defendant discussed medication education with him is a matter within his personal knowledge,

and thus cannot be "speculative" or "conclusory." To the extent his testimony conflicts with other evidence in the record, that raises a credibility question for the factfinder. *See Jeffreys*, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). And unlike in *Jeffreys* or *Deebs*, Mr. Suarez's testimony is far from the only evidence supporting his claim. *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019) (distinguishing *Jeffreys* on this basis). For instance, the absence of required medication education can also be inferred from the fact that none of the treating defendants' notes "[d]ocument the discussion of the risks and benefits of medication (medication education) with" Mr. Suarez, much less Mr. Suarez's "response to the discussion and apparent level of understanding"—as OMH policy requires. A867. More broadly, the inadequacy of the treating defendants' medical care is not limited to the presence or absence of medication education, but applies to their entire course of conduct throughout Mr. Suarez's confinement at Downstate. *Supra* pp. 5-10.

### B.    Defendants' Reliance On Mr. Suarez's Purported "Refusal" To Take Medication Is A Misdirection

Taking a different tack, defendants argue that the treating defendants' knowledge of Mr. Suarez's actual or threatened decompensation wouldn't have mattered. That argument is equally unsuccessful.

16

Defendants contend that "[e]ven if each treatment provider was aware that Suarez may, in theory, decompensate without medication, each provider observed that Suarez consistently refused medication." Response Br. 25. They suggest that in light of that refusal, taking any action beyond what defendants did here would have amounted to an unlawful administration of forced medication. Response Br. 36-37 (citing *Rivers v. Katz*, 495 N.E.2d 337 (N.Y. 1986)). But that misstates the facts—or at the very least, construes disputed facts in defendants' favor. Dr. Qayyum explained that he "discontinued the prescription" for Mr. Suarez's medication after Mr. Suarez stated that "he no longer wished to take" it. A446. That means that for the rest of his time at Downstate, Mr. Suarez "did not have an active prescription and therefore, at no time did he refuse to take prescribed medication." A446 (Qayyum declaration). *Contra* Response Br. 36 (asserting that Mr. Suarez "consistently refused medication"). Thus, rather than refusing antipsychotics that were not available to him during his subsequent meetings with treating defendants, Mr. Suarez was instead expressing his mistaken understanding that he had no mental illness and did not need medication. *See, e.g.*, A504 (Dr. Reynolds noting that Mr. Suarez "does not believe he has any mental illness").

Similarly misguided is defendants' suggestion that medication education would have been useless. They argue that Mr. Suarez "points to nothing in the record to support the inference that he would have agreed to take psychotropic medication

17

if he had received medication education"—and that "[i]f anything, Suarez's testimony that he did not understand his mental illness and so, did not believe he needed medication while at Downstate, supports the contrary inference." Response Br. 40-41. But Mr. Suarez testified that "the treatment and therapy that" he "received at Kirby" helped him "understand that [he] need[ed] to continue to take [his] medication." A390.

Even assuming the only reasonable inference from the record is that Mr. Suarez refused medication *and* would not have responded to medication education, defendants offer no support for their theory that prison officials can and should do nothing in that situation, even if they know decompensation will likely occur. In fact, the cases they cite on this issue reach the opposite conclusion: they explain that when refusal to accept certain treatment creates a risk, a provider acts properly when they mitigate that risk. *See Hernandez v. Keane*, 341 F.3d 137, 147 (2d Cir. 2003) (when plaintiff's refusal to take anti-seizure medication increased the risks of surgery, defendants were not deliberately indifferent by delaying that surgery). And it blinks reality that the treating defendants, experienced mental health professionals in a highly controlled environment, would have had no other adequate treatment or monitoring options available to them. (Indeed, one of those potential options—Downstate's monitored mental health unit—is discussed in the record. A333;

A865.). The Court should reject defendants' false dichotomy between inaction and forced medication.

## C.    The DOCCS Defendants Cannot Avoid Liability

While the DOCCS defendants—Morton and Horan—were not mental-health professionals, they learned specific information about the risk of Mr. Suarez's decompensation. In light of that knowledge, their decisions to place and keep him in SHU and keeplock confinement amounted to deliberate indifference. *See* Opening Br. 43-46.

**1.** Defendants contend that Morton "had no reason to believe that the care Suarez was receiving while at Downstate was inadequate." Response Br. 45. That cannot be squared with Morton's AOT petition, in which he described Mr. Suarez's "history of lack of compliance with treatment for mental illness that" had "resulted in one or more acts of serious violent behavior" and the "risk" of future violent behavior without further "treatment," A514-16—treatment he was concededly not receiving at Downstate. *Contra* Response Br. 26. Given that, Morton's inaction cannot be characterized as "affirmative and reasonable steps" to protect Mr. Suarez: any benefits the AOT order would have conferred after his release would have come too late. *Contra* Response Br. 44 (citing *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009) (no deliberate indifference to detainee's risk of suicide when defendants seized dangerous items from detainee, called for emergency assistance,

restrained and surrounded detainee, and upon his escape chased him up the stairs to a roof); and *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022)).

**2.** Defendants assert that "there is no evidence" Horan "intentionally interfered with [Mr. Suarez's] course of treatment," and that Horan did not believe Mr. Suarez "was at risk of decompensating." Response Br. 30, 44. But Horan expressly stated his belief that Mr. Suarez's decompensation had caused his misconduct, opining that Mr. Suarez "got off the rails" and "did something wrong to an officer." A1067; A1167. And defendants have no response to the fact that Horan sentenced Mr. Suarez to disciplinary housing in the form of 30 days' keeplock confinement—thus *ignoring* DiNardo's recommendation to him that Mr. Suarez was "not suitable for confinement in disciplinary housing due to the mental illness." A1166; *see* A333; A356 (describing keeplock as "confinement sanction"). That makes this case the opposite of *Brock v. Wright* (cited at Response Br. 30), where a prison official who deferred to a healthcare provider's recommended course of treatment was not deliberately indifferent. 315 F.3d 158, 162 (2d Cir. 2003).

**3.** The recent decision in *Idiakheua v. Morton* exemplifies the errors made by the district court with respect to Morton and Horan (as well as Baker, discussed above). There, Mr. Suarez's mother—whom Mr. Suarez had attacked after his release in a psychotic episode—sued those defendants, alleging they violated her Fourteenth Amendment rights by failing to treat Mr. Suarez's illness and thereby

20

creating a danger to her. The district court denied defendants' summary judgment motion, finding "a genuine dispute as to whether Defendants witnessed Mr. Suarez's decompensation." *Idiakheua v. Morton*, No. 20-CV-4169 (NGG) (SJB), 2024 WL 417058, at *17 (E.D.N.Y. Feb. 5, 2024).

Defendants here attempt to distinguish *Idiakheua* based on "the specific facts in that record." Response Br. 19 n.7. But the court relied on many of the same facts that are present here, including: that "Horan received testimony from Ms. DiNardo in which she noted that Mr. Suarez was not suitable for confinement in disciplinary housing due to his mental illness"; that Morton's role led him "to make regular rounds among inmates in SHU" and receive "reports concerning the welfare of inmates at Downstate or the conditions of their confinement"; and that "Mr. Suarez's deteriorating condition was evident" to his mother "when visiting him a few days prior to his release." *Idiakheua*, 2024 WL 417058, at *17. The court in *Idiakheua* also recognized that a reasonable jury could infer "[t]hat the risks of segregated confinement were reasonably known to the Defendants" based on "their experience at Downstate" and "the long line of research considering the harms from segregated

confinement." *Id.* at *15.[1]  Mr. Suarez makes the very same arguments here, based on the same facts.

### D.   Each Defendant Had Authority And Responsibility To Remove Mr. Suarez From Harmful Conditions Of Confinement

As Mr. Suarez explained, both the treating defendants and the DOCCS defendants were deliberately indifferent in part by failing to remove Mr. Suarez from SHU and keeplock confinement.  Opening Br. 30-32.  Defendants disagree on both fronts.  They assert that the treating defendants cannot be held responsible for the conditions of Mr. Suarez's confinement because they "could not alter [Mr.] Suarez's disciplinary penalty."  Response Br. 26.  In the same breath, they assert the DOCCS defendants cannot be held responsible because they "believed that OMH clinicians were monitoring [Mr.] Suarez's conditions and would remove him from disciplinary housing if appropriate."  Response Br. 26.  Defendants cannot have it both ways.  Rather, the record shows that all defendants had the authority and responsibility to mitigate harmful conditions of confinement:  the treating defendants by transferring Mr. Suarez to a monitored mental health unit (A333; A865), the DOCCS defendants

---

[1] Unlike the Eighth Amendment deliberate-indifference standard, Ms. Idiakheua's Fourteenth Amendment claim requires only an objective showing. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).  The court in *Idiakheua*, however, relied at least in part on disputed evidence about defendants' subjective knowledge.

by "refer[ring]" Mr. Suarez to OMH for further treatment they believed necessary (A335).[2]

Defendants also suggest there is a bright-line rule where harmful confinement must last for a specific "prolonged" period of time that is not met here. Response Br. 42-43, 46. But as the decision defendants cite explains, whether a particular form of confinement "violates the Eighth Amendment … depends on the duration *and conditions* of the confinement." *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015) (emphasis added). Whether those conditions violate the Eighth Amendment turns in part on a particular individual's circumstances, including whether they, like Mr. Suarez, suffer from pre-existing serious mental illness. Opening Br. 30-31 (collecting cases); *see also Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 517 (3d Cir. 2024) (noting that whether an individual has a "known preexisting serious mental illness" is relevant to the conditions-of-confinement inquiry). Indeed, defendants largely ignore the relationship between their inadequate medical care and their decisions regarding Mr. Suarez's disciplinary confinement. But as the facts here show, those two courses of conduct cannot be separated from each other for

---

[2] Defendants implicitly acknowledge as much when they subsequently admit that the question whether the treating defendants should have removed Mr. Suarez from disciplinary confinement turns on whether they knew of a risk of decompensation. Response Br. 47.

23

purposes of the deliberate-indifference analysis, because both contributed to Mr. Suarez's decompensation. *See* Opening Br. 26-46.

## CONCLUSION

The district court's judgment should be reversed and the case remanded for trial.

Dated: November 26, 2024       Respectfully submitted,

/s/ Alexandra M. Avvocato

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20036

ROBERT M. QUACKENBUSH
THE LEGAL AID SOCIETY
PRISONERS' RIGHTS PROJECT
49 Thomas Street, 10th Floor
New York, NY 10013

JAMIE A. LEVITT
JOCELYN E. GREER
ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019
Telephone: (212) 336-4149
AAvvocato@mofo.com

*Counsel for Plaintiff-Appellant Elvin Suarez*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rule 32.1(a)(4) because it contains 5,337 words, excluding those parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016, in 14-point Times New Roman font.

Dated: November 26, 2024 _____/s/ Alexandra M. Avvocato_____

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system on November 26, 2024.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.


Dated:  November 26, 2024                          s/ Alexandra M. Avvocato


ny-2812684